FILED ELECTRONICALLY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
MEYER MINTZ and MEIR SPEAR,         :
                                    :
                  Plaintiffs,       :    No. 05 CV 4904 (LTS)
                                    :
        -against-                   :
                                    :    <u>ORAL ARGUMENT REQUESTED</u>
RONALD BARON, MORTY SCHAJA,         :
LINDA S. MARTINSON, STEVEN B.       :
DODGE, NORMAN S. EDELCUP, DAVID     :
I. FUENTE, CHARLES N. MATHEWSON,    :
HAROLD W. MILNER, RAYMOND           :
NOVECK, DAVID A. SILVERMAN,         :
BAMCO, INC., BARON CAPITAL, INC.,   :
BARON GROWTH FUND and BARON         :
SMALL CAP FUND,                     :
                                    :
                  Defendants.       :
------------------------------------------------------- x

### DEFENDANTS' MEMORANDUM OF LAW
### IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

SKADDEN, ARPS, SLATE,                 SCHULTE ROTH & ZABEL LLP
  MEAGHER & FLOM, LLP                 Brooks R. Burdette (BB 8380)
Seth M. Schwartz (SS 2530)            919 Third Avenue
Beverly A. Farrell (BF 2244)          New York, NY 10022
Four Times Square                     (212) 756-2000
New York, New York 10036
(212) 735-3000

Attorneys for Defendants              Attorneys for Defendants
Ronald Baron, Morty Schaja,           Steven B. Dodge, Norman S. Edelcup,
 Linda S. Martinson, BAMCO Inc.,      David I. Fuente, Charles N. Mathewson,
 Baron Capital, Inc., Baron Growth    Harold W. Milner, Raymond Noveck and
 Fund and Baron Small Cap Fund        David A. Silverman

FILED ELECTRONICALLY

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 3

    A.    The Parties ................................................................................................................ 3

    B.    Rule 12b-1 Fees ....................................................................................................... 4

        1.    Rule 12b-1 ....................................................................................................... 4

        2.    NASD Regulation of 12b-1 ............................................................................ 6

    C.    The Funds' 12b-1 Plan and Disclosure in Fund Prospectuses ............................. 7

    D.    The Partial Closure of the Funds ........................................................................... 7

    E.    The Complaint ......................................................................................................... 8

ARGUMENT .......................................................................................................................... 9

I.    COUNT ONE FAILS TO STATE A CLAIM UNDER SECTION 36(b) OF THE ICA .................................................................................................................. 9

    A.    Applicable Standards ............................................................................................... 9

    B.    Plaintiffs' Allegations Do Not State a Claim Under Section 36(b) ..................... 10

        1.    The Funds Did Not Close Completely ........................................................ 10

II.    COUNT TWO OF THE COMPLAINT SHOULD BE DISMISSED .......................... 13

    A.    The Court Should Decline Supplemental Jurisdiction Over the State Law Claims .................................................................................................. 13

    B.    Plaintiffs Failed to Satisfy the Universal Demand Requirement ....................... 14

        1.    Plaintiffs' Claims Are Derivative in Nature .............................................. 14

        2.    The Failure to Make a Demand Is Fatal to Count Two ............................ 15

CONCLUSION ..................................................................................................................... 16

FILED ELECTRONICALLY

Defendants[1] respectfully submit this memorandum of law in support of their motion for an order, pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, dismissing the complaint for failure to state a claim for relief and failure to comply with the requirements of Rule 23.1.

## INTRODUCTION

Plaintiffs are purported shareholders of two mutual funds, Baron Growth Fund and Baron Small Cap Fund (the "Funds"), respectively. In their complaint, plaintiffs allege that defendants violated Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b), and breached fiduciary duties purportedly owed under state law by continuing to charge the Funds certain sales and distribution fees, known as "12b-1 fees," after the Funds purportedly were closed to new investors. According to the complaint, (a) "there is absolutely no justification for continuing to charge 12b-1 fees after the Funds closed to new investors and have ceased soliciting new investors" (Compl. ¶ 11); and (b) the increase in total 12b-1 fees paid by the Funds since 2003 "had absolutely no relationship to any actual expenses incurred for promotion" of Fund shares. (Id. ¶ 45) These allegations are fatally flawed and fail to state any claim for relief.

Contrary to the allegations of the complaint, the Funds were never fully closed to new investors. Rather, as expressly disclosed in the prospectus issued by the Funds,[2] the Funds

---

[1]  The named defendants are Ronald Baron, Morty Schaja, Linda S. Martinson, Steven B. Dodge, Norman S. Edelcup, David I. Fuente, Charles N. Mathewson, Harold W. Milner, Raymond Noveck, David A. Silverman (collectively, the "Individual Defendants"), BAMCO, Inc. ("BAMCO"), Baron Capital, Inc. ("Baron Capital"), Baron Growth Fund and Baron Small Cap Fund.

[2]  In ruling on a motion to dismiss, the Court properly may consider the Fund prospectus both because plaintiffs have relied on it in framing the complaint (Compl. ¶ 39), see Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991), and because the prospectus is a public disclosure document "required by law to be, and that [has] been filed with the SEC.'" In re JP

remain open to a large number of existing and potential new investors who may continue to purchase additional Fund shares, including (i) existing Fund shareholders; (ii) financial advisers with existing clients in the funds; (iii) clients of retirement plan providers or 529 plan providers;[3] and (iii) employees of the Funds' investment adviser (BAMCO) and their family members. Consequently, the Funds continue to incur 12b-1 distribution expenses attendant to the sale of new Fund shares to individuals and entities permitted to make or add to investments in the Funds. Moreover, as to <u>all</u> Fund shareholders, including existing shareholders who have purchased <u>no</u> additional Fund shares, the Funds have continued to incur significant 12b-1 service fees charged by broker-dealers and other third-party intermediaries for the shareholder liaison services they provide, such as responding to shareholder inquiries, providing information on their investments and maintaining shareholder records. The complaint, however, alleges no facts which attempt to explain, much less demonstrate, why the 12b-1 fees paid to cover these ongoing, legitimate expenses were "so disproportionately large that [they] bear no reasonable relationship to the services rendered" to the Funds. <u>Gartenberg v. Merrill Lynch Asset Mgmt, Inc.</u>, 694 F.2d 923 928 (2d Cir. 1982). The complaint therefore states no claim. <u>See, e.g.</u>, <u>Krantz v. Prudential Invs. Fund Mgmt. LLC</u>, 305 F.3d 140, 143 (3d Cir. 2002) (affirming dismissal of Section 36(b) claim

---

<u>Morgan Chase Sec. Litig.</u>, 363 F. Supp. 2d 595, 615 (S.D.N.Y. 2005) (citation omitted). Moreover, where, as here, "a plaintiff's allegations are contradicted by such a document, those allegations are insufficient to defeat a motion to dismiss." <u>Matusovsky v. Merrill Lynch</u>, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

[3] Effective May 1, 2005, as to Baron Growth Fund only, the retirement plan exception was modified to provide that the Fund remains open to participants in retirement plans or 529 plans that already offer, or have committed by May 1 to offer, Baron Growth Fund.

where, as here, plaintiff "failed to allege any facts indicating that the fees received were disproportionate to services rendered").[4]

As to the complaint's state law claims, they are derivative in nature in that they allege injury directly to the Funds and only indirectly to plaintiffs and the Funds' other shareholders. In that connection, the claims are premised on the theory that the 12b-1 fees, which are paid from the assets of the Funds, purportedly are excessive and "constitute a permanent reduction in the net asset value of the Funds' shares." (Compl. ¶ 34)

Given the derivative nature of these claims, they are subject to the demand requirements applicable under the law of Massachusetts. (The Funds are series of Baron Investment Funds Trust, which was organized under Massachusetts law). Accordingly, pursuant to the Massachusetts universal demand statute, a pre-suit demand is required in all circumstances. See Mass. Gen. Laws Ann. ch. 156D, § 7.42 (West Supp. 2005). Plaintiffs' failure to make such a demand here mandates dismissal of plaintiffs' state law claims. ING Principal Protection Funds Derivative Litig., 369 F. Supp. 2d 163, 170 (D. Mass. 2005).

## STATEMENT OF FACTS

A. **The Parties**

Plaintiff Meyer Mintz is an alleged shareholder of the Baron Growth Fund, and plaintiff Meir Spear is an alleged shareholder of the Baron Small Cap Fund. (Compl. ¶¶ 17, 18.) The shares of each Fund constitute a series issued by Baron Investment Funds Trust (the "Trust"), "a no-load, open ended diversified management investment company originally organized and

---

[4]   There is another separate and independent defect in the Section 36(b) claim insofar as it has been asserted against BAMCO. Pursuant to the statute, only the recipients of 12b-1 compensation may properly be named as defendants. Because the complaint does not allege - - nor could it – that defendant BAMCO received 12b-1 fees, there is and can be no basis for purporting to charge it with violations of Section 36(b).

established [as a business trust], under the laws of the Commonwealth of Massachusetts on February 19, 1987." (Ex. 4 at 3; see Compl. ¶¶ 21-22.)[5] Each Fund series of shares reflects "a separate portfolio with separate assets and liabilities from any other series." (Ex. 4 at 3.)

Defendant BAMCO serves as investment adviser to the Funds, and defendant Baron Capital is a registered broker-dealer and the distributor of the shares issued by the Funds. (Ex. 3 at 18; Compl. ¶¶ 19, 20.) Defendants Ronald Baron, Morty Schaja, Linda S. Martinson, Steven B. Dodge, Norman S. Edelcup, David I. Fuente, Charles N. Mathewson, Harold W. Milner, Raymond Noveck, and David A. Silverman are Trustees of the Funds. (Compl. at ¶¶ 23-32.) With the exception of Ronald Baron, Morty Schaja and Linda Martinson, who are officers of the Funds, all of the Individual Defendants are independent trustees unaffiliated with the Funds, BAMCO or Baron Capital. (Ex. 4 at 12-17.)

**B.   Rule 12b-1 Fees**

   1.   Rule 12b-1

Section 12(b) of the ICA prohibits any open-end mutual fund from acting as a distributor of its own shares (except through an underwriter) in contravention of SEC rules and regulations. 15 U.S.C. § 80a-12(b). This statutory provision was enacted to "'protect[] the open-end company against excessive sales, promotion expenses, and so forth.'" Payments of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 23260 (June 21, 1988) (quoting Investment Trusts and Investment Companies: Hearings on H.R. 10065 Before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess. 112 (1940) (statement of David Schenker)). Exercising its authority under the statute, in 1980 the SEC

---

[5]   All "Ex. __" references are to the accompanying Declaration of Seth M. Schwartz.

promulgated Rule 12b-1 to permit a fund to bear the expense of distributing its shares pursuant to a plan adopted in accordance with the rule.  17 C.F.R. § 270.12b-1(b) (2005).

In adopting Rule 12b-1, the SEC expressed its concerns regarding: (1) potential conflicts of interest between the interests of a fund and those of its investment adviser with respect to deciding whether the fund should bear distribution expenses; (2) the likelihood that the fund would benefit from paying for such expenses; and (3) fairness to existing shareholders.  See Bearing of Distribution Expenses by Mutual Funds, Securities Act Release No. 6294, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898, 73901 (Nov. 7, 1980).  To address these concerns, Rule 12b-1 "contain[s] substantive standards to protect fund shareholders, guidelines to ensure an orderly process of decision-making by directors, and accountability for exercising the authority to use fund assets for distribution."  Id. at 73901.

Some of these protective standards are as follows:

(a)  Distribution fees must be set pursuant to a written plan that describes the proposed financing in all material respects, see 17 C.F.R. § 270.12b-1(b) (2005);

(b)  The plan must be approved by at least a majority of the fund's outstanding voting securities, and the plan and all related agreements must be approved by the fund's board of directors as a whole and separately by the disinterested directors who "have no direct or indirect financial interest in the operation of the plan or in any agreements related to the plan," 17 C.F.R. § 270.12b-1(b)(1) (2005);

(c)  The plan may continue for more than one year only so long as specifically approved at least annually by the board and its independent directors, 17 C.F.R. § 270.12b-1(b)(3)(i) (2005);

(d)  The board of directors must receive at least quarterly a written report of the amounts expended and the purposes for such expenditures, 17 C.F.R. § 270.12b-1(b)(3)(ii) (2005);

(e)  The plan must provide that it may be terminated at any time by vote of a majority of the disinterested directors or by vote of a majority of the fund's outstanding voting securities, 17 C.F.R. § 270.12b-1(b)(3)(iii) (2005); and

(f)   In considering a plan, the directors must conclude, "in the exercise of reasonable business judgment and in light of their fiduciary duties under state law and under sections 36(a) and (b). . . of the [ICA], that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-1(e) (2005).

The complaint nowhere alleges that the Funds or their Trustees failed to comply with any one of the foregoing standards.

2.   <u>NASD Regulation of 12b-1 Fees</u>

Pursuant to Section 22(b) of the ICA, 15 U.S.C. § 80a-22(b), Congress granted to the National Association of Securities Dealers ("NASD") the authority to regulate all mutual fund sales charges, including 12b-1 fees. <u>See</u> Self-Regulatory Organizations; Proposed Rule Change by NASD Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, Exchange Act Release No. 29070, 56 Fed. Reg. 16137, 16139 (April 19, 1991). NASD Conduct Rule 2830 sets the permissible sales charges for distribution of mutual fund shares. NASD Conduct Rule 2830(b)(8) defines "sales charge" as "all charges or fees that are paid to finance sales or sales promotion expenses, including front-end, deferred and asset-based sales charges," <u>id.</u>, and defines "asset-based sales charge" as a "sales charge that is deducted from the net assets of an investment company and does not include a service fee." NASD Conduct Rule 2830(b)(8)(A).

Pursuant to NASD Conduct Rule 2830, a mutual fund may pay both an "asset-based sales charge" and a "service fee," defined as "payments by an investment company for personal service and/or the maintenance of shareholder accounts." NASD Conduct Rule 2830(b)(9). The asset-based sales charge may not exceed 0.75% per annum of the average annual net assets of the mutual fund plus interest, and the service fee may not exceed 0.25% of average annual net assets. NASD Conduct Rule 2830(d)(2)(E) (i), (d)(5). Here, the Funds' 12b-1 plan authorizes the Funds to pay an asset-based fee equal to 0.25% of average net assets,

6

which amount is used to cover distribution charges and service fees of third party service providers.

C.  **The Funds' 12b-1 Plan and Disclosure in Fund Prospectuses**

Federal law requires all mutual funds to provide a fund prospectus to current and potential investors, either before or at the time any investor purchases fund shares.  See Michael Glazer, Prospectus Disclosure and Delivery Requirements § 4:6.2, in chapter 4 in Clifford E. Kirsch, ed., Mutual Fund Regulation (Clifford E. Kirsch, ed., 2d ed. 2005).  In accordance with the federal securities laws and the regulations promulgated thereunder by the SEC, the prospectus must describe in plain English, among other things, the fund's investment objectives, risks, fees and expenses, and instructions on how to buy and sell fund shares.  See SEC Form N1-A.

Information concerning 12b-1 fees must be disclosed in the text of a fund's prospectus.  See The Investment Company Regulation Deskbook § 3.4[1], at 3-10 (Amy L. Goodman, ed. 1997).  In compliance with this requirement, the prospectus of the Funds discloses in pertinent part as follows:

> The Funds have adopted a plan under rule 12b-1 that allows the Funds to pay distribution fees for the sale and distribution of their shares and for services provided to shareholders . . . . The 12b-1 plan authorizes the Funds to pay Baron Capital, the Funds' distributor, a distribution fee equal to 0.25% of each Fund's average daily net assets.

(Ex. 3 at 19.)

D.  **The Partial Closure of the Funds**

The Fund prospectus also provides information regarding the partial closure of the Funds.  In that connection, the Funds specifically disclose in the prospectus that they will remain

open to the following investors, each of whom remains free to continue purchasing additional Fund shares:

- existing Fund shareholders.
- financial advisors with existing clients in the Funds.
- clients of retirement plan providers or 529 plan providers.
- employees of the Adviser and their family members.

(Exs. 1-2; Ex. 3 at 1, 20-21; Compl. ¶ 41.)

### E. The Complaint

Count One of the complaint alleges that defendants BAMCO and Baron Capital violated Section 36(b) of the ICA. Count Two alleges that all defendants purportedly breached fiduciary duties allegedly owed to plaintiffs and other Fund shareholders under state law. (Compl. ¶¶ 53- 65.) Plaintiffs purport to bring both counts on behalf of a class of all persons who were or are shareholders of Baron Growth Fund since September 30, 2003 and Baron Small Cap Fund since April 22, 2005. (Compl. ¶ 66.)

The gravamen of the complaint is that defendants are liable to plaintiffs because "[a]lthough the Growth Fund has been closed to new investors since September 12, 2003, and the Small Cap Fund closed since April 22, 2005, the Funds continue to charge investors 12b-1 fees related to marketing and distribution at the same rate as when they were open to investors and with no apparent justification." (Compl. ¶ 2.) The complaint further alleges that the 12b-1 fees paid after the Growth Fund closed had "absolutely no correlation to any increase in promotion, marketing, distribution or administrative expenses incurred by the Growth Fund – which is the only justification for charging shareholders any 12b-1 fees" and that "shareholders of the Small Cap Fund have also been compelled to pay 12b-1 fees despite the fact that it too ceased its marketing and distribution activities." (Compl. ¶¶ 12, 13.) Plaintiffs seek recovery of

8

the 12b-1 fees paid by the Funds and an injunction enjoining further payment of the fees. (Compl. ¶ 3.)

## ARGUMENT

### I. COUNT ONE FAILS TO STATE A CLAIM UNDER SECTION 36(b) OF THE ICA

#### A. Applicable Standards

Section 36(b) of the ICA provides in pertinent part that:

> the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment company or any affiliated person of such investment adviser.

15 U.S.C. § 80a-35(b).

To state a claim under this statute, plaintiffs must plead facts sufficient to show that the Funds' 12b-1 fees paid to Baron Capital[6] were "so disproportionately large that [they] bear[] no reasonable relationship to the services rendered [to the Funds] and could not have been the product of arm's-length bargaining." Gartenberg, 694 F.2d at 928. Accord, e.g., Krantz, 305 F.3d at 143 (affirming dismissal of Section 36(b) claim where, as here, plaintiff "failed to allege any facts indicating that the fees received were disproportionate to services rendered"), cert. denied, 537 U.S. 1113 (2003); Verkouteren v. BlackRock Fin. Mgmt., Inc., No. 98 Civ. 4673, 1999 WL 511411 (S.D.N.Y. July 20, 1999), aff'd, 208 F.3d 204 (2d Cir. 2000) (affirming dismissal of Section 36(b) claim where, as here, the complaint failed "to plead facts sufficient to

---

[6] As alleged in the complaint (Compl. ¶ 39), Baron Capital is the only defendant that has received 12b-1 fees and, pursuant to Section 36(b)(3) of the ICA, no claim under the statute may "be brought against . . . any person other than [a] recipient of such compensation." 15 U.S.C. § 80a-35(b)(3).

9

show that the amount of the advisory fee was 'so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining'") (quoting Gartenberg, 694 F.2d at 928); Migdal v. Rowe Price-Fleming Int'l, Inc., No. AMD 98-2162, 2000 WL 350400, at *3 (D. Md. Mar. 20, 2000), aff'd, 248 F.3d 321 (4th Cir. 2001); Levy v. Alliance Capital Mgmt. L.P., No. 97 Civ. 4672, 1998 WL 744005, at *4 (S.D.N.Y. Oct. 26, 1998), aff'd mem., 189 F.3d 461 (2d Cir. 1999).

To adequately state a claim under Section 36(b), a complaint "may not simply allege in a conclusory manner that advisory fees are 'excessive.'" Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 327 (4th Cir. 2001); accord Levy, 1998 WL 744005, at *2. Rather, the complaint must allege facts that, if true, would be sufficient to "support a claim that the fees at issue are excessive." Migdal, 248 F.3d at 327 (emphasis added); Levy, 1998 WL 744005, at *2. In the same vein, plaintiffs cannot survive a motion to dismiss where, as here, their complaint does little more than make conclusory mention of the Gartenberg standard without also pleading facts sufficient to show "how or why the fees are 'so disproportionately large that [they] bear[] no reasonable relationship to the services rendered.'" Yampolsky v. Morgan Stanley Inv. Advisers Inc., No. 03 Civ. 5710 (RO), 2004 WL 1065533, at *2 (S.D.N.Y. May 12, 2004).

### B.  Plaintiffs' Allegations Do Not State a Claim Under Section 36(b)

#### 1.  The Funds Did Not Close Completely

The gravamen of Count One of the complaint is that BAMCO and Baron Capital allegedly violated Section 36(b) of the ICA because the 12b-1 fees paid by the Funds purportedly "lacked any reasonable relationship to the actual services provided to the Funds or actual expenses incurred on behalf of the Funds." (Compl. ¶ 57.) The principal "factual" allegation made by plaintiffs in attempting to support this legal conclusion is that "there is absolutely no justification for continuing to charge 12b-1 fees after the Funds have closed to new investors."

10

(Compl. ¶ 11; see also id. ¶¶ 38, 42, 46.) This contention, however, is meritless as a matter of law in that it is contradicted by, among other things, other allegations of the complaint and the Fund prospectuses on which the allegations are based.

In the complaint, plaintiffs admit, as they must, that the Funds continue to sell Fund shares to "financial advisers with existing clients in the fund, clients of retirement plan providers or 529 plan providers, and employees of the Adviser and their family members." (Compl. ¶ 41.) Indeed, this fact is plainly disclosed in the Funds' prospectus. Nevertheless, the complaint nowhere addresses the distribution expenses incurred by the Funds in the ongoing sale of shares to these new and existing investors, much less provides any facts sufficient to show that the amount of the expenses bears no reasonable relationship to the services provided by the investment advisers and plan providers who are recommending the purchase of Fund shares.

Plaintiffs' complaint also almost completely ignores service fees (also known as "trail commissions") -- an entire category of 12b-1 fees that, by themselves, amply justify the 0.25% charge paid by the Funds in accordance with NASD regulations. Such fees, which are regularly and properly incurred by mutual funds, regardless of whether they are closed to new investors, are paid by funds or their distributors to unaffiliated third parties, such as banks, broker-dealers or investment advisers for servicing customer accounts on a continuing basis. As explained by the SEC:

> Trail commissions are relatively commonplace in mutual fund fee structures. Funds generally use them to compensate broker-dealers for services such as responding to shareholders' inquiries concerning yields, exchange privileges, redemption rights, shareholder account balances, and other matters. Trail commissions may also provide incentives for continued broker promotion of the fund to minimize shareholder redemptions . . . .

(Ex. 5 at 3 Part D.) See also Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 501 (S.D.N.Y. 1988) (finding that "[p]ayments to financial consultants to halt the out-flow of assets and

11

improve shareholder service" are properly made pursuant to 12b-1 plans), aff'd, 875 F.2d 404 (2d Cir. 1989); Charter Total Return Fund, SEC No Action Letter, 1989 SEC No-Act. LEXIS 784, at *1 (June 20, 1989) (indicating that broker-dealer service fees, if paid by a fund, should be paid pursuant to a 12b-1 plan).

Despite the wide-use of 12b-1 service fees in the industry,[7] and the SEC's recognition that they are appropriately covered under a Rule 12b-1 plan, plaintiffs make almost no mention of these fees, much less attempt to explain why the amount of the fees bears no reasonable relation to the investor services rendered. To be sure, the complaint does make passing reference to the fees paid to certain broker-dealers, such as Schwab and Fidelity, known as "Fund Supermarkets," claiming in conclusory fashion that "subsequent to the Funds' closure, shareholders reaped absolutely no benefits" from being serviced by Fund Supermarkets. (Compl. ¶¶ 49-51.) But this bald allegation is directly contradicted by the pronouncements of the SEC, which has specifically found that Fund Supermarkets offer "a menu of services including: establishing, maintaining, and processing changes in shareholder accounts; communicating with shareholders; [and] preparing account statements and confirmations." Investment Co. Inst., SEC No Action Letter, 1998 SEC No-Act. LEXIS 976, at *1-2 (Oct. 30, 1998). Plaintiffs' failure to even attempt to explain the relation between the 12b-1 fees paid by the Funds and the menu of services provided by the supermarkets is fatal to the complaint. As explained by one court when dismissing a remarkably similar claims challenging 12b-1 fees under Section 36(b):

> Plaintiffs also fail to state a claim with respect to the .25% service fees. In the amended complaint, Plaintiffs do not allege that the service fees exceeded the ongoing expenses associated with maintaining shareholder accounts. Plaintiffs

---

[7] According to a recent survey conducted by the Investment Company Institute in 2004, 52 percent of all 12b-1 fees were paid by funds to compensate broker-dealers and other intermediaries for ongoing shareholder services provided after an investor's initial purchase of fund shares. (See Ex. 6 (Investment Company Institute, How Mutual Funds Use 12b-1 Fees, at 2-4 (Feb. 2005))).

allege no facts that, if true, would indicate that the service fees are unrelated to the shareholder services provided by broker dealers.

ING Principal Protection Funds Derivative Litig., 369 F. Supp. 2d at 169.

The complaint in this case is similarly bereft of sufficient factual allegations regarding the ongoing service fees incurred by the Funds, warranting dismissal of Count One here. See Yampolsky, 2004 WL 1065533, at *2 (dismissing Section 36(b) claim where, as here, "conspicuously absent from . . . the complaint[] are any factual allegations as to the actual . . . distribution services rendered").[8]

## II. COUNT TWO OF THE COMPLAINT SHOULD BE DISMISSED

### A. The Court Should Decline Supplemental Jurisdiction Over the State Law Claims

Because plaintiffs have stated no federal claim against defendants in Count One of the Complaint, the Court also should dismiss their state law claim in Count Two rather than retain jurisdiction over it. The exercise of supplemental jurisdiction over state law claims where all federal claims are dismissed is a matter of discretion, not right. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); 28 U.S.C. § 1367(c)(3). Ordinarily, when all federal claims are dismissed early in the proceedings, a federal court should exercise discretion to dismiss the state law claims too. Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988); Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994).

---

[8] Pfeiffer v. Bjurman, Barry & Assocs., No. 03 Civ. 9741 (DLC), 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) is readily distinguishable, and any reliance of the case would be misplaced. In Pfeiffer, the plaintiff alleged that the defendant mutual fund was completely closed. Id. at *1. Consequently, in contrast to this case, where the Funds remain open and continue to sell shares to new and existing investors, there were no ongoing distribution expenses at issue in Pfeiffer that the fund continued to incur. Pfeiffer also fails to address the indisputable significance of service fees, and there is no discussion of whether plaintiff made sufficient allegations of fact as to whether those fees were "excessive."

**B.     Plaintiffs Failed to Satisfy the Universal Demand Requirement**

Even if the Court were to retain jurisdiction over the state law claims, those claims nevertheless should be dismissed because they are defective on their face.

1.     Plaintiffs' Claims Are Derivative in Nature

Because the shares of the Funds are series of a Massachusetts business trust, the law of Massachusetts governs whether plaintiffs' claims are derivative or direct. Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 108-09 (1991). Under Massachusetts law, a claim will be deemed derivative where the injury alleged by plaintiff "is inflicted on the corporation and the only injury to the shareholder is the indirect harm which consists of the diminution in the value of his or her shares,." Mutchka v. Harris, No. SACV0534JVSANX, 2005 WL 1414304, at *5 (C.D. Cal. June 8, 2005) (applying Massachusetts law) (citation omitted); accord, e.g., Farragut Mortgage Co. v. Arthur Anderson LLP, No. 95-6231-B, 1999 WL 823656, at *17 (Mass. Super. Ct. Aug. 5, 1999). In making this determination, courts "look to the body of the complaint, not to the plaintiff's designation or stated intention." Farragut Mortgage, 1999 WL 823656, at *17.

In this case, the complaint alleges injury solely to the Funds as a result of the Funds' payment of 12b-1 fees from the assets of the Funds. As alleged in the complaint:

> [S]hareholders of the Funds have . . . been assessed a 12b-1 fee of 0.25% of the Funds' average daily net assets purportedly for expenses incurred in connection with promoting, marketing and distributing shares of the Funds. These expenses are generally assessed on a monthly basis and constitute <u>a permanent reduction in the net asset value of the Funds' shares for that month</u>. Every such dollar of expense paid by the Funds is borne by each shareholder as a <u>pro rata deduction from the net asset value per share of his holdings</u> in the Fund(s).

(Compl. ¶ 34 (emphasis added).)

The shares of the Funds are sold and redeemed at a price equal to the Funds' per share net asset value. (Ex. 3 at 20.) Consequently, the injury alleged by plaintiffs is a diminution in the value of their Fund shares, alleged harm that is quintessentially derivative in

14

nature. See, e.g., Mutchka v. Harris, 2005 WL 1414304, at *5 ("If the injury merely is a reduction in the price of the stock, then the suit must be derivative."); Farragut Mortgage, 1999 WL 823656, at *17 ("'If a plaintiff alleges . . . breach of fiduciary duty resulting in the diminution of the value of the corporate stock or assets, the claim is one held by the corporation itself, and is thus derivative if brought by an investor.'") (citation omitted).

        2.      The Failure to Make a Demand
             Is Fatal to Count Two

Given the derivative nature of the claim alleged in Count Two, it is subject to the requirements of Massachusetts's universal demand statute. See Mass. Gen. Laws Ann. ch. 156D § 7.42 (West Supp. 2005). Pursuant to that statute, before commencing this action, plaintiffs were required to make a written demand on the Funds' Trustees requesting that they bring a lawsuit in the name of the Funds to redress the purported wrongs alleged in the complaint. As recently explained by one court in language fully applicable here:

> Section 7.42 provides, in relevant part, "No shareholder may commence a derivative proceeding until: (1) a written demand has been made upon the corporation to take suitable action." There are no exceptions.

ING Principal Protection Funds, 369 F. Supp. 2d at 170 (emphasis added).[9] Moreover, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, in any complaint filed in a derivative action, the shareholder plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority . . . , and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1.

---

[9] In this context, courts applying Massachusetts law in derivative suits against business trusts have uniformly required shareholders to follow the Massachusetts pre-suit demand rules. See, e.g., ING Principal Protection Funds, 369 F. Supp. 2d at 170-72; Clairdale Enters., Inc. v. C.I. Realty Investors, 423 F. Supp. 257, 260-61 (S.D.N.Y. 1976); Greenspan v. Lindley, 36 N.Y.2d 473, 478-79, 330 N.E.2d 79, 81, 369 N.Y.S.2d 123, 126-27 (1975).

Here, plaintiffs made no pre-suit demand on the Trustees to commence a lawsuit against the purportedly responsible parties to redress the injury allegedly suffered as a result of the Funds' payment of the 12b-1 fees at issue. Moreover, the complaint nowhere alleges, much less with particularity, that plaintiffs made any such pre-suit demand. Accordingly, Count Two the Complaint should be dismissed. See ING Principal Protection Funds, 369 F. Supp. 2d at 170-72.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that their motion to dismiss the complaint be granted in all respects.

Dated: July 8, 2005
New York, New York

Respectfully submitted,

/s/ Seth M. Schwartz
Seth M. Schwartz (SS 2530)
Beverly A. Farrell (BF 2244)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM, LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Defendants
Ronald Baron, Morty Schaja,
  Linda S. Martinson, BAMCO
Inc., Baron Capital, Inc., Baron Growth
Fund and Baron Small Cap Fund

Brooks R. Burdette (BB 8380)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
(212) 756-2000

Attorneys for Defendants
Steven B. Dodge, Norman S. Edelcup,
David I. Fuente, Charles N. Mathewson,
Harold W. Milner, Raymond Noveck and
David A. Silverman