UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

MEYER MINTZ and MEIR SPEAR,      :

         :

      Plaintiffs,       :

         :

      -against-       :    Civil Action No. 05 CV 4904 (LTS)

         :

RONALD BARON, MORTY SCHAJA,    :

LINDA S. MARTINSON, STEVEN B.   :

DODGE,  NORMAN S. EDELCUP, DAVID  :   [FILED ELECTRONICALLY]

I. FUENTE,    CHARLES N.    :

MATHEWSON, HAROLD W. MILNER,  :

RAYMOND NOVECK, DAVID A.    :

SILVERMAN, BAMCO, INC., BARON   :

CAPITAL, INC., BARON GROWTH FUND, :

and BARON SMALL CAP FUND,    :

         :

      Defendants,      :

-------------------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

ZIMMERMAN, LEVI & KORSINSKY, LLP
Eduard Korsinsky (EK 8989)
39 Broadway, Suite 1601
New York, New York 10006
Tel: (212) 363-7500

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
I.      Facts Alleged in the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     Plaintiffs Have Satisfied the Demand Requirement With
        Respect to the Growth Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
I.      Plaintiffs Have Adequately Pleaded Facts Which,
        if Proven True, Show that the 12b-1 Fees Charged
        are Disproportionate to the Services Rendered . . . . . . . . . . . . . . . . . . . . . . . . 6

II.     Count II of the Complaint Should Be Sustained . . . . . . . . . . . . . . . . . . . . . . 12
        A.      The universal demand requirement does not apply to
                plaintiffs' breach of fiduciary duty claim because plaintiffs'
                claim is direct, not derivative in nature . . . . . . . . . . . . . . . . . . . . . . . . 12

                i.      Rule 12b-1 establishes a direct fiduciary duty under state law
                        between the Funds' trustees and the shareholders,
                        independent of the fiduciary duty owed to the Funds . . . . . 14

                ii.     The shareholders are being injured directly as a result of
                        defendants' breach of fiduciary duty Funds . . . . . . . . . . . . . . 16

        B.      In any event, plaintiffs have satisfied the demand
                requirement with respect to the Growth Fund . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## **PRELIMINARY STATEMENT**

Plaintiffs Meyer Mintz and Meir Spear respectfully submit this memorandum of law in opposition to defendants' motion to dismiss the Complaint.  Defendants' motion should be denied because the Complaint pleads sufficient facts, which, if proven true, demonstrate that certain marketing and distribution related expenses paid by shareholders of the Baron Growth Fund and Baron Small Cap Fund (collectively, the "Funds") after they closed to new investors on September 12, 2003 and April 22, 2005, respectively, had no reasonable relationship to the marketing or distribution services rendered to the shareholders.

The Court should also deny defendants' motion insofar as it seeks dismissal of plaintiffs' breach of fiduciary duty claim based on Massachusetts state law. First, because the Complaint states a claim for violation of § 36(b) of the Investment Company Act of 1940 ("ICA"), there is no basis for this Court to refuse to exercise supplemental jurisdiction over the breach of fiduciary duty claim. Second, because the breach of fiduciary duty claim is a direct, not a derivative claim, the universal demand requirement imposed by M.G.L. 156D §7.42 does not apply to that claim, and the failure to plead satisfaction of the demand requirement in accordance with Fed. R. Civ. P. 23.1 does not require its dismissal. Finally, in any event, the plaintiffs have in fact satisfied the demand requirement

with respect to the Growth Fund.  Accordingly, defendants' motion should be denied in its entirety.

## STATEMENT OF FACTS

### I.   Facts Alleged in the Complaint

Plaintiff Meyer Mintz is a shareholder of the Baron Growth Fund and plaintiff Meir Spear is a shareholder of the Baron Small Cap Fund.  Complaint, ¶¶17, 18.  Baron Capital, Inc. ("Baron Capital") is a registered broker-dealer and the distributor of shares of the Funds.   Complaint, ¶20.  BAMCO, Inc., a subsidiary of Baron Capital, is the investment advisor to the Funds. *Id.*, ¶32.  The individual defendants are trustees of the Funds.  *Id.*, ¶¶22-31.

As the investment adviser, BAMCO is responsible for making investment decisions concerning the Funds' assets and, together with the Funds' officers, administers the Funds' daily operations.  *Id.* For providing these investment advisory services, the Funds pay BAMCO an advisory fee based on average daily net assets of the Funds.  *Id.*

Pursuant to Rule 12b-1 of the ICA, shareholders of the Funds have been paying a fee of 0.25% of their average daily net assets purportedly for expenses incurred in connection with promoting, marketing and distributing the Funds' shares ("12b-1 fees").  *Id.*, ¶33.  These expenses are directly charged to each shareholder on a monthly basis.  *Id.*

2

12b-1 fees are only permitted pursuant to a plan of distribution duly adopted and approved by the trustees and shareholders of the fund ("12b-1 Plan"), which must be kept under continuing review in accordance with Rule 12b-1 of the ICA. *Id.*, ¶7. Section 12b-1(e) of the ICA requires that trustees may only approve and ratify a 12b-1 Plan if they conclude that, "in light of their fiduciary duties under state law and under sections 36(a) and (b) of the Act, that there is a reasonable likelihood that the plan will benefit the company <u>and</u> **its shareholders**. . . . *Id.*, ¶8 (emphasis supplied).

The Growth Fund has been closed to new investors since September 12, 2003, and the Small Cap Fund has been closed since April 22, 2005. *Id.*, ¶¶40, 46. Nevertheless, the defendants continue to charge shareholders 12b-1 fees for marketing and distribution even though the Funds are no longer marketing to new investors. *Id.*, ¶¶2, 12, 13, 37, 41-43. Indeed, after the Growth Fund closed to new investors, the 12b-1 fees charged to shareholders increased by 80% as compared to the prior year (when the Fund was open to new investors).[1] *Id.*, ¶¶12, 43, 45. Plaintiffs also anticipate that shareholders of the Small Cap Fund will continue to pay 12b-1 fees for marketing and distribution even though the

---

[1] For the year ended September 30, 2004, when the Growth Fund was closed to new investors, shareholders paid $6,848,646 in 12b-1 fees, as compared to $3,811,078 in fiscal 2003 when the fund was open to new investors. *Id.*, ¶43.

3

Small Cap Fund closed to new investors on April 22, 2005. *Id.*, ¶46. Plaintiffs,
therefore, allege that the 12b-1 fees charged to shareholders of both Funds are
unreasonable, excessive and disproportionate to the services rendered because the
Funds are no longer marketing and distributing to new investors and because the
fees increased in proportion to the appreciation in the Funds' asset base rather
than in proportion to the actual services rendered. *Id.*, ¶12.

## II.   Plaintiffs Have Satisfied the Demand Requirement With Respect to the Growth Fund

On January 19, 2005, plaintiffs' counsel, on behalf of plaintiff Meyer Mintz,
wrote to Linda Martinson, Esq., Baron Capital's General Counsel, enclosing a draft
complaint setting forth specific allegations concerning the payment of excessive
12b-1 fees in connection with the Baron Growth Fund. *See* Declaration of Eduard
Korsinsky, dated September 6, 2005 ("Korsinsky Decl."), ¶ 2 and Exh. A. The
letter specifically stated that its purpose was "to inform the directors/trustees of
the Fund of the allegations stated in the complaint and demand that they take
action to eliminate the improper fees. *Id.*

By letter dated February 1, 2005, Skadden, Arps, Slate, Meagher & Flom,
LLP, attorneys for Baron Capital, stated that the trustees would examine the issues
raised in the January 19 letter and draft complaint at their next scheduled meeting,
in early May. *See id.*, ¶ 3 and Exh. B. By letter dated May 12, 2005, Skadden, Arps

4

informed plaintiffs' counsel that the trustees had reviewed the allegations of the

draft complaint, considered them to be meritless, and therefore "rejected [plaintiff

Mintz's] demand." *See id.*, ¶ 4 and Exh. C.  Plaintiffs filed this action on May 23,

2005, more than 90 days after the January 19, 2005 letter.

## ARGUMENT

Dismissal of a complaint before discovery is a "drastic step" that must not

be employed unless it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim that would entitle him to relief.  *E.g., Wade v. Johnson

Controls, Inc.*, 693 F.2d 19, 22 (2d Cir. 1982).  In determining whether to dismiss a

complaint, the court must accept all factual allegations in the complaint as true

and draw all reasonable inferences in favor of the plaintiff.  *E.g., Olmstead v. Pruco

Life Ins. Co. of N.J.*, 283 F.3d 429, 431 (2d Cir. 2002).  It is not the court's function to

weigh evidence that might be presented; rather, the court merely determines

whether the complaint itself is legally sufficient. *See Villager Pond, Inc. v. Town of

Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

Moreover, when a complaint or cause of action is dismissed pursuant to

Rule 12(b)(6) and the plaintiff requests permission to file an amended complaint,

that request should ordinarily be granted, especially where, as here, there has been

no prior amendment.  *See, e.g., Riccuiti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d

Cir. 1991); *Luce v. Edelstein*, 802 F.2d 49, 57 (2d Cir. 1986) (allowing plaintiffs in

securities action to amend to remedy deficiencies identified in Rule 12(b)(6)

motion). Therefore, if this Court finds it necessary for plaintiffs to have alleged

demand, plaintiffs should be granted leave to amend the Complaint to add

allegations demonstrating satisfaction of the demand requirement.

**I.    Plaintiffs Have Adequately Pleaded Facts Which, if Proven True, Show that the 12b-1 Fees Charged are Disproportionate to the Services Rendered**

As Defendants concede, (Defendants' Memorandum of Law in Support of

Their Motion to Dismiss the Complaint ["Def. Memo"], p.9), in a case alleging

violation of §36(b) of the ICA, in order to survive a motion to dismiss a plaintiff

need only plead facts which, if proven true, show that the 12b-1 fees charged are

disproportional to the services rendered to the Fund. *See, e.g., Gartenberg v. Merrill*

*Lynch Asset Mgt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982); *Strougo v. Bea Assoc.*, 2000

WL 45714, *7 (S.D.N.Y. Jan. 19, 2000). Plaintiffs have met this burden.

The Complaint alleges that the defendants continue to charge shareholders

ongoing 12b-1 fees for marketing and distribution even though the Funds have

ceased marketing their shares to new investors. Complaint, ¶¶2, 12, 13, 37, 41-43.

The Complaint further alleges that after the Growth Fund closed to new investors,

the 12b-1 fees charged increased by 80% as compared to the prior year (when the

fund was open to new investors), when instead they should have been reduced or

altogether eliminated. *Id.*, ¶¶12, 43, 45. The Complaint also alleges, upon

6

information and belief, that the Small Cap Fund will continue assessing its

shareholders 12b-1 fees at the same rate post-closure as it did before April 22,

2005, when the Fund was open to new investors. *Id.*, ¶46.  The Complaint further

alleges that the 12b-1 fees paid by the Funds' shareholders are unreasonable,

excessive and disproportionate to the services rendered because the 12b-1 fees

increased in proportion to the appreciation in the Fund's asset base rather than

because of an increase in services provided to the Funds' shareholders. *Id.*, ¶12.

These allegations are sufficient to satisfy the notice pleading requirement of Fed.

R. Civ. P. 8(a)(2), which the Supreme Court has reaffirmed applies to all civil cases

(save for a few exceptions not relevant here). *See Swierkiewicz v. Sorema, N.A.*, 534

U.S. 506, 513 (2002); *see also Strigliabotti v. Franklin Resources, Inc.*, 2005 WL 645529,

at *3-*4 (N.D. Cal. Mar. 7, 2005) (complaint that alleged facts concerning amount of

fees charged and nature of services rendered, and specifically described

disproportionate relationship between the two, stated a claim under liberal

pleading standards of Rule 8).

In this regard, *Pfeiffer v. Bjurman, Barry & Assocs*, 2004 WL 1903075

(S.D.N.Y. Aug. 26, 2004), is virtually indistinguishable from this case.  In *Pfeiffer*,

the plaintiff alleged that the defendants, Bjurman Barry & Associates ("BB&A")

and its no-load mutual fund, Bjurman, Barry Micro Cap Growth Fund, violated

§36(b) by charging excessive promotion, distribution, administrative, transfer

7

agent and "other" fees after the fund closed to new investors. *Id.* at *1. The

plaintiff also contended that BB&A breached its fiduciary duties under §36(b) by

charging shareholders for those expenses in proportion to the Fund's assets rather

than the services rendered. *Id.* at *3. On these facts, the Court denied the

defendants' motion to dismiss the complaint under Rule 12(b)(6).[2] Moreover, in at

least two other cases with virtually identical facts, motions to dismiss on the

pleadings have been denied and arguments similar to those presented by

defendants in this case have been rejected. *See e.g., Zucker v. Aim Advisors, Inc., et.*

*al.,* 371 F.Supp.2d 845, 848-49 (S.D. Tex. Jan. 20, 2005); *Lieber v. Invesco Funds Group,*

*et. al.,* 371 F.Supp.2d 852, 855-56 (S.D. Tex. Jan. 20, 2005).

Defendants' contention that the Complaint is insufficient because it alleges

in a "conclusory manner" that the challenged fees are excessive, (Def. Memo,

p.10), is itself a conclusory argument that conveniently overlooks the specific

allegations in the Complaint that the 12b-1 fees charged have been excessive and

not reasonably related to the services provided after the Funds' closure. By

contrast, none of the cases cited by defendants contained any allegations

concerning the relationship between the fees charged and the services rendered.

---

[2] Defendants' contention that *Pfeiffer* is distinguishable because the plaintiff in that case alleged
that the defendant mutual fund was "completely closed" (Def. Memo, p.13, n.8) is plainly wrong.
In *Pfeiffer,* the fund was not completely closed: existing shareholders, and shareholders of other
Bjurman, Barry funds were still allowed to purchase shares of the fund. 2004 WL 1903075, at *1,
n.3. Additionally, the fund reserved the right to reopen to investors at any time. *Id.*

In *Migdal v. Rowe Price-Fleming International, Inc.*, the plaintiffs offered four allegations as evidence of excessive fees: the amount of fees charged by the funds involved; the fact that two or three similar funds offered lower fee rates than the funds involved in that case, while outperforming them; the fact that the funds did not meet their preselected benchmark performance standards; and the fact that, despite the funds' underperformance, the defendant investment advisers' earnings increased by more than twenty percent. 248 F.3d 321, 327 (4th Cir. 2001), *aff'g*, 2000 WL 350400 (D. Md. Mar. 20, 2000). The court upheld the dismissal of the plaintiffs' §36(b) claim based on its observation that the plaintiffs did not allege any facts pertinent to the *relationship* between the 12b-1 fees charged and the services rendered. *Id.*[3]

In *Krantz v. Prudential Investments Fund Management, LLC*, the plaintiffs alleged only that the 12b-1 fees were excessive because the directors of the fund involved in that case served on multiple boards for various Prudential funds and received a large aggregate compensation for their combined services; the complaint did not contain any allegations concerning the relationship between the fees charged and the services rendered. 305 F.3d 140, 142 (3d Cir. 2002) (*per curiam*). Similarly, in *Levy v. Alliance Capital Management, L.P.*, the plaintiff alleged

---

[3] To the extent that *Migdal* could be read to require a heightened, fact pleading standard in §36(b) cases, that decision predates *Swierkiewicz*, and has been effectively been overruled, as to this issue, by the later Supreme Court case.

only that Alliance received "substantially more" in advisory fees and expenses
under a new investment advisor agreement than it had under the prior agreement,
and that expenses formerly paid by Alliance were absorbed by the entity that
maintained the funds at issue under the new agreement.  1998 WL 744005, at *4
(S.D.N.Y. Oct. 26, 1998).  As in *Krantz*, the complaint did not allege any facts
concerning the relationship between the fees charged and the services rendered.
*Id.*

Finally, in *Yampolsky v. Morgan Stanley Investment Advisers, Inc.*, the
plaintiffs relied heavily on generalities about deficiencies in the securities industry
and statements made by industry critics and insiders.  2004 WL 1065533, at *2
(S.D.N.Y. May 12, 2004) (*mem.*).  The only factual allegations specific to Morgan
Stanley asserted that the fund at issue underperformed as compared to the S&P
500 and had an unfavorable expense ratio, and that the trustees were "poor
watchdogs."  *Id.*[4]  Again, no facts were alleged concerning the relationship
between fees and services rendered.

Defendants' contention that the 12b-1 fees charged before closure for
marketing, distribution and shareholder servicing (and that have increased 80%
since closure) are somehow justified post-closure to pay for shareholder servicing

---

[4] The final case cited by defendants, *Verkouteren v. Blackrock Financial Management*, 1999 WL
511411 (S.D.N.Y. Jul. 20, 1999), does even not set forth the allegations the court found to be
inadequate.

alone (Def. Memo, p.11), raises a question of fact that cannot be dealt with in the

context of a motion to dismiss but can only be entertained after discovery and at

the summary judgment or trial stage.[5]  Similarly, defendants' contention that the

"menu" of services offered by the Fund Supermarkets, such as establishing,

maintaining and processing charges in shareholder accounts; communicating with

shareholders; and preparing account statements and confirmations (Def. Memo,

p.12), somehow justifies charging the shareholders excessive 12b-1 fees is a

question of fact that is irrelevant to whether or not the Complaint states a claim

sufficient to survive a motion to dismiss.  *Cf. Migdal*, 248 F.3d at 327 (plaintiffs'

comparison between funds at issue and three other funds was not particularly

meaningful because it did not address particular services offered by defendants in

that case); *Yampolsky*, 2004 WL 1065533 at *2 (complaints at issue were bereft of

factual allegations concerning "the *actual* . . . management and distribution

services rendered by *these* defendants) (emphasis in original).[6]

Accordingly, because the Complaint sufficiently alleges that the 12b-1 fees

being charged to the Funds' shareholders since closure are excessive and not

---

[5] For this reason, *Krinsk v. Fund Asset Mgt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), which did not involve a motion to dismiss, is not relevant.

[6] Because, as demonstrated above, Count I states a viable federal claim, the Court should reject Defendants' request that it decline to exercise supplemental jurisdiction over Plaintiffs' state law claim (Count II). *See* Def. Memo, p.13.

11

reasonably related to the services rendered, defendants motion to dismiss Count I should be denied.

## II.    Count II of the Complaint Should Be Sustained

Defendants contend that the universal demand requirement contained in M.G.L. 156D §7.42[7] bars plaintiffs' state law breach of fiduciary duty claim (Count II) because plaintiffs did not make a demand on the Funds before filing suit.  This court should reject defendants' argument for two reasons.  First, the demand requirement is inapplicable here because plaintiffs' claim is a direct, rather than derivative claim.  Second, plaintiffs have, in any event, satisfied the demand requirement with respect to the Growth Fund.

### A.    The universal demand requirement does not apply to plaintiffs' breach of fiduciary duty claim because plaintiffs' claim is direct, not derivative in nature

Under the law of Massachusetts and all other states, it is axiomatic that a derivative suit must allege an injury to the corporation.  *See Blasberg v. Oxbow Power Corp.*, 934 F. Supp. 2d 21, 26027 (D. Mass. 1996); *see generally* 12B *Fletcher*

---

[7] This provision states, in relevant part:

No shareholder may commence a derivative proceeding until

    (1)    a written demand has been made upon the corporation to take suitable action; and

    (2)    90 days have elapsed from the date the demand was made . . . unless . . . the shareholder has earlier been notified that the demand has been rejected by the corporation . . . .

*Cyclopedia of the Law of Private Corporations* §5911 (perm. ed. rev. vol. 1993). On the

other hand, where "the duty breached was owed to the stockholder and . . . he or

she can prevail without showing an injury to the corporation," the claim is

indisputably direct. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039

(Del. 2004);[8] *see also Lawton v. Nyman*, 327 F.3d 30,30 (1st Cir. 2003) ("The usual rule

is that an action grounded in an injury to a corporation must be brought as a

derivative suit. If, however, the injury is the result of a violation of a duty owed

directly to shareholders, they may sue on their own behalf."). Therefore, if the

right to sue flows from "the breach of a duty owed directly to the plaintiff

independent of the plaintiff's status as a shareholder, investor, or creditor of the

corporation, the suit is direct." *Branch v. Ernst & Young*, 1995 WL 791941 at *4 (D.

Mass. 1995).

In this case, Rule 12b-1 expressly carves out a fiduciary duty owed by the

defendants directly to each and every shareholder of the Funds, independent of

the fiduciary duty owed to the Funds themselves. *See* 17 C.F.R. §270.12b-1(e) (The

trustees must conclude in "light of their fiduciary duties under state law . . . that

there is a reasonable likelihood that the plan will benefit the company and its

---

[8] The test for determining whether a claim is direct or derivative is the same under both
Massachusetts law and Delaware law. *See Hogan v. Baker*, 2005 WL 1949476, *4 (N.D. Tex.).
Although *Tooley* is a case decided in the Chancery Court in Delaware, it represents the most
recent and comprehensive articulation of the direct/derivative test by the court noted to be most
proficient in matters of corporate governance.

13

shareholders.")  In addition, it is the individual shareholders, and not the Funds,

who bear the burden of the excessive 12b-1 fees charged because it is the

shareholders who pay the 12b-1 fees for marketing and distribution.  *See e.g.*,

Korsinsky Decl, Exh. D, excerpt of Form N-CSR for Baron Investment Funds Trust

for March 31, 2005.[9] Because the shareholders themselves are suffering the injury

directly as a result of defendants' breach of fiduciary duty owed directly to them,

Count II is direct, and not derivative.

> **i.      Rule 12b-1 establishes a direct fiduciary duty under
> state law between the Funds' trustees and the
> shareholders, independent of the fiduciary duty owed
> to the Funds**

Rule 12b-1 was enacted specifically to safeguard shareholders against the

conflicts of interest that inherently arise when the marketing and distribution

related expenses of the advisor are charged to the shareholders.  To that end, Rule

12b-1  imposes an affirmative duty upon the Funds' trustees to oversee the

adoption, operation and continuation of a formal 12b-1 plan which is supposed to

precisely describe and justify the 12b-1 fees.  Rule 12b-1 requires the trustees to

conclude that, "in light of their fiduciary duties under ***state law*** . . . , there is a

---

[9] On a motion to dismiss, "[a] district court may take judicial notice of the contents of relevant
public disclosure documents required to be filed with the SEC as facts 'capable of accurate and
ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Fed.
R. Evid. 201(b)(2)."  *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *see also, e.g.*,
*Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993) (citing *Kramer* for proposition that courts may look
to federally-mandated disclosure documents in deciding Rule 12(b)(6) motions.

reasonable likelihood that the plan will benefit the company and *its shareholders*."
17 C.F.R. §270.12b-1(e)(emphasis added).

The duties that Rule 12b-1 imposes on the trustees as protectors of
shareholders' interests include a duty to approve the 12b-1 plan and any related
agreements (17 C.F.R. §270.12b-1(b)(1)); a duty to review, at least quarterly, "a
written report of the amounts so expended and the purposes for which such
expenditures were made" (17 C.F.R. §270.12b-1(b)(3)(ii)); and "a duty to request
and evaluate, and any person who is a party to any agreement with such company
relating to such plan shall have a duty to furnish, such information as may
reasonably be necessary to make an informed determination of whether the plan
should be implemented or continued." 17 C.F.R. §270.12b-1(d).

Additionally, Rule 12b-1 requires further safeguards to protect
shareholders' assets by (i) requiring a 12b-1 plan to be approved by a vote of at
least a majority of the outstanding voting securities (*see* 12b-1(b)(1)); (ii) requiring
that the trustees secure shareholder approval for any material increase in the
amounts to be spent under the 12b-1 plan (*see* 12b-1(b)(4)); and (iii) providing for
the termination of a 12b-1 plan or any agreement related to the plan based on a
majority of voting securities (*see* 12b-1(b)(3)(iii) and 12b-1(b)(3)(iv)(A)).

In sum, because, as demonstrated below, it is the shareholders – and not
the Funds or the Funds' advisor – who are paying the 12b-1 fees, Rule 12b-1

recognizes and imposes a special duty upon the trustees to protect shareholders

from harm.  It is precisely for the purpose of protecting the shareholders that Rule

12b-1 establishes the strict set of guidelines under which shareholders' assets may

be used to pay marketing and distribution related expenses.  Because Rule 12b-1

creates a direct fiduciary duty between the trustees and the shareholders for 12b-1

fees, and because any injury resulting from the breach of such duty is suffered by

the shareholders directly (for they are the ones who pay the 12b-1 fees), Count II is

direct, and not derivative.

        **ii.**      **The shareholders are being injured directly as a result of defendants' breach of fiduciary duty**

The Funds' shareholders are being compelled to pay 12b-1 fees for

marketing and distribution related expenses despite the fact that the Funds are no

longer marketing and distributing to new investors, and the shareholders are

therefore being injured directly as a result of this fee gouging.  It is an economic

fact that, because the Funds do not hold any assets other than those owned by the

shareholders, the Funds' shareholders directly bear certain of the Funds' expenses

on a pro-rata basis. *See Strigliabotti v. Franklin Resources*, 2005 WL 645529, at *8

("the financial harm from overcharges is harm to individual investors, who own

the Funds' assets and bear its expenses directly on a pro rata basis.").  That the

shareholders pay for the Funds' 12b-1 expenses is also explicitly acknowledged in

the Funds' SEC filings, which state: "As a **shareholder** of the Fund, **you** may incur

two types of costs: ongoing expenses and transaction costs.  Ongoing expenses

include advisory fees, **distribution and services (12b-1) fees** and other expenses."

*See* Korsinsky Decl., Exh. D, Excerpt of Form N-CSR for Baron Investment Funds

Trust for March 31, 2005 (emphasis added).   The Funds' prospectus even provides

shareholders with a formula and instructions to calculate their out of pocket

expenses associated with ownership of the Funds' shares:

ACTUAL EXPENSES

      The table below titled "*Based on Actual Total Return*" provides information about actual account  values and actual  expenses.  You may use the  information provided in this table, together with the amount you invested, to estimate the expenses that you paid over the period.  To estimate the  expenses you paid on your account, divide your ending account value by $1,000 (for example, an $8,600 ending account value divided by $1,000 = 8.6), then multiply the result by the number under the heading titled "*Expenses Paid During the Period*".

BASED ON ACTUAL TOTAL RETURN*

| | ACTUAL TOTAL RETURN | BEGINNING ACCOUNT VALUE OCTOBER 1, 2004 | ENDING ACCOUNT VALUE MARCH 31, 2005 | ANNUALIZED EXPENSE RATIOS | EXPENSES PAID DURING THE PERIOD# |
|---|---|---|---|---|---|
| BARON ASSET FUND | 15.64% | $1,000 | $1,156 | 1.34% | $7.20 |
| BARON GROWTH FUND | 16.93% | 1,000 | 1,169 | 1.32% | 7.14 |
| BARON SMALL CAP FUND | 18.74% | 1,000 | 1,187 | 1.34% | 7.31 |
| BARON iOPPORTUNITY FUND | 6.86% | 1,000 | 1,069 | 1.50% | 7.74 |
| BARON FIFTH AVENUE GROWTH FUND | 5.66% | 1,000 | 1,057 | 1.40% | 7.18 |

*Id*. Thus, the Fund admits in its own public documents that it is the shareholders,

and not the Funds, who pay the 12b-1 fees.  Particularly in the case of 12b-1 fees,

shareholders are considered the direct payors because, under Rule 12b-1, these

fees are supposed to pay for services that benefit the shareholders.  It is therefore

the shareholders, and not the Funds, who are **directly** harmed if the 12b-1 fees are

17

being extracted for little or nothing in return.  Because the shareholders themselves are injured, their claim is direct in nature.

Moreover, the harm that defendants have directly inflicted upon the shareholders does not somehow become indirect merely because it is also possible to quantify the actual economic harm to the shareholders in terms of a reduction in the Net Asset Value (NAV) of their shares.  Because all of the assets held by the Funds belong to the shareholders, it is a matter of simple arithmetic to quantify the improper economic harm caused to the shareholders as an actual dollar amount per shareholder (as defendants demonstrate in their Form N-CSR filing), or as a reduction in the NAV[10] as a whole.  The algebraic representation of the injury to the shareholders, however, does not alter the fact that defendants have breached their fiduciary duty to the shareholders and harmed the shareholders directly by compelling them to pay 12b-1 fees for little or nothing in return.  This suit seeks to recover those out-of-pocket expenses for the benefit of the shareholders individually who were forced to pay such excessive fees.

Defendants' reliance on *Mutchka v. Harris* is entirely misplaced because the plaintiff in that case did not challenge improper expenses paid by shareholders.

---

[10] For example, if a fund held $1,000,000 in shareholder assets, had 100,000 shares outstanding and incurred $100,000 in expenses, the expenses paid by the shareholders can be quantified as a dollar amount per share (in this case each shareholder paid $1 in expenses for each share held) or as a reduction in the NAV (in this case from a NAV of $10 per share ($1,000,000 assets /100,000 shares) to $9 per share (($1,000,000 assets - $100,000 expenses)/100,000 shares).

373 F. Supp. 2d 1021, 1023 (C.D. Cal. 2005).  Rather, the complaint there alleged

that defendants failed to have the funds participate and collect recoveries in class

action settlements in which the Funds were eligible to participate.   *Id*. at 1023.  The

court held that because only the funds (and not the shareholders) were able to

participate in the class actions settlements, a failure to participate would be an

injury to the funds (rather than to specific shareholders), which shareholders

would experience only indirectly as a potential diminution in the NAV of their

shares.

The shareholders in *Mutchka* did not directly pay any allegedly improper

fund expenses, nor did any shareholder in *Mutchka* have standing to participate in

any class action settlement directly because the fund (and not the shareholders)

had the requisite standing to participate in the class action lawsuits.  In contrast,

the shareholders in this case have been forced to pay excessive 12b-1 fees for

virtually nothing in return.  As demonstrated above from the Funds' SEC filings,

defendants even provide a formula for calculating each shareholder's damages

resulting from the breach so that the shareholders' injury is not "merely" a

reduction in NAV but rather an actual, direct and calculable harm to each and

every shareholder.

Similarly, in the other case defendants rely on, *Farragut Mortgage Co. v.

Arthur Anderson LLP*, the court held that the harm to the shareholders caused by

19

KPMG's negligent misrepresentations of the poolability-of-interest in a merger

was indirect because the injury was suffered by the corporation itself and the

shareholders' injury was only an indirect diminution of share value. 1999 WL

823656, at *18  (Mass. Super. Aug. 15, 1999).  As in *Mutchka*, the plaintiff in

*Farragut* also did not allege that he was forced to pay any improper charges or

expenses directly, nor could the plaintiff there demonstrate a direct injury (or even

a direct fiduciary duty owed) apart from the general harm to the fund.  In this

case, however, the shareholders have been injured because the trustees breached a

fiduciary duty owed directly to shareholders under Rule 12b-1.[11]

The facts of this case more closely resemble those in *Strigliabotti*—in which

plaintiffs alleged that various expenses charged to the fund's shareholders,

including 12b-1 expenses, were improper—than those in *Mutchka*, *Farragut*

*Mortgage* and *Hogan*.  The economic reality of mutual fund expenses, as explained

in *Strigliabotti* and in defendants' own SEC filings, shows that the shareholders,

and not the Funds, have suffered the harm resulting from defendants' breach

---

[11] Similarly, in *Hogan v. Baker*, 2005 WL 1949476 (N.D. Tex. Aug. 12, 2005), the plaintiff's claim
was based on the defendants' failure to participate in class action settlements.  The court relied on
*Mutchka* to reach the same conclusion that such a claim is derivative.  As in *Mutchka*, the claims in
*Hogan* had nothing to do with a challenge to the expenses that shareholders are being forced to
pay directly.

because the shareholders have paid the excessive 12b-1 fees.  Accordingly,

plaintiffs' state law claims are direct.[12]

## B.    In any event, plaintiffs have satisfied the demand requirement with respect to the Growth Fund

Defendants' contention that "Plaintiffs made no pre-suit demand on the

Trustees to commence a lawsuit against the purportedly responsible parties to

redress the injury allegedly suffered as a result of the Funds' payment of the 12b-1

fees at issue" (Def., Memo., p.16) is false.  While the Complaint does not contain

allegations concerning the plaintiffs' satisfaction of the Massachusetts universal

demand requirement—it did not have to because it pleads a direct case—

defendants (and their counsel) are well aware that plaintiffs did, in fact, make a

pre-suit demand.

_____

[12] In *In re Eaton Vance Mutual Funds Fee Litigation*, the court held that a claim of improper asset-based fees was derivative, stating that "[t]he shareholders … did not pay the fees at issue directly … because the fees were paid out of Fund assets."  2005 WL 1813001, at *10 (S.D.N.Y. Aug. 1, 2005).  This statement is at odds with the economic reality of mutual funds as explained in *Strigliabotti*.  Furthermore, in this case, the Funds' SEC filings acknowledge that the 12b-1 fees are taxed directly to the shareholders rather than to the Funds and even provide a formula for calculating each shareholder's out-of-pocket expenses.

More importantly, the *Eaton Vance* court acknowledged that, because 12b-1 fees may be assessed differently to different classes of shareholders within the same fund (*e.g.*, A, B and C class shareholders), 12b-1 fees in particular are direct expenses of the shareholders rather than expenses of the fund as a whole.  *Id.* at *11.  Nevertheless, *Eaton Vance* found the claims to be derivative because the plaintiff alleged only that the "shareholders who held shares during the class period were damaged as a result of the excessive and improper fees **charged to the Eaton Vance Funds**."  *Id.* (Emphasis added).  Presumably, if the plaintiff had properly pled his complaint, and if the case had involved 12b-1 fees only (*Eaton Vance* involved 12b-1, advisory, and other fund fees), the Court would have acknowledged that, at the very least, the claims involving 12b-1 fees were direct.

As set forth in the Korsinsky Declaration, on January 19, 2005, plaintiffs' counsel, on behalf of plaintiff Meyer Mintz, wrote to Linda Martinson, Esq., the General Counsel of Baron Capital, enclosing a draft complaint setting forth specific allegations concerning the payment of excessive 12b-1 fees by the Baron Growth Fund. *See* Korsinsky Decl., ¶ 2 and Exh. A.  The letter specifically stated that its purpose was "to inform the directors/trustees of the Fund of the allegations stated in the complaint and demand that they take action to eliminate the improper fees. *Id.*

Despite its present contention that plaintiffs never made a demand on the Funds, Baron Capital clearly acknowledged that the January 19, 2005 letter was a demand. By letter dated February 1, 2005, Skadden, Arps, Slate, Meagher & Flom, LLP, attorneys for Baron Capital, stated that the trustees would examine the issues raised in the January 19 letter and draft complaint at their next scheduled meeting in early May. *See id.*, ¶ 3 and Exh. B.  Plaintiffs' counsel therefore waited until the outcome of the May meeting.  By letter dated May 12, 2005, Skadden, Arps informed plaintiffs' counsel that the trustees had met, reviewed the allegations of the draft complaint, considered them to be meritless, and therefore "rejected [plaintiff Mintz's] demand." *See id.*, ¶ 4 and Exh. C.  Only after receiving such rejection of plaintiff's "demand" did plaintiffs file this action.

Not only is defendants' assertion that plaintiffs did not make a demand

factually wrong, plaintiffs' January 19 letter was clearly a sufficient demand with respect to the Growth Fund.  Although there are few Massachusetts cases[13] addressing the sufficiency of a demand, the First Circuit has stated that, under Massachusetts law, "[t]he demand must be specific.  It is not enough, on the one hand, for the plaintiff to allege that the directors knew they had a right of action and have done nothing about it [citation omitted] or, on the other hand, that they were requested to bring the suit, if they were not given full knowledge of the basis for the claim and full opportunity to act."  *Halprin v. Babbitt*, 303 F.2d 138, 141 (1st Cir. 1962).  Other courts have addressed the requirements for a sufficient demand. For example, the Supreme Court of Idaho explained that:

> '[t]he demand on the directors need not assume a particular form nor need it be made in any special language.  However, the stockholder must make an earnest and sincere, and not a feigned or simulated, effort to induce the directors to take remedial action in the corporate name.  Statements should be presented to the directors showing the wrong complained of, accompanied by sufficient responsible data which will enable the directors to determine whether litigation could be engaged in with some hope of success. The shareholder must state facts, not mere general charges and conclusions.'

---

[13] "Although Rule 23.1 sets forth the procedural requirements for litigating a derivative action under the diversity jurisdiction of a federal court . . . , the rule requires only that plaintiff allege with particularity the efforts made, if any, to induce the directors to bring the litigation.  The standard by which those efforts are measured must be located outside the rule and determined by examining the purposes served by the demand requirement."  *Burghart v. Landau*, 821 F. Supp. 173, 177-78 (S.D.N.Y.), *aff'd*, 9 F.3d 1538 (2d Cir. 1993), *cert. denied*, 510 U.S. 1196, 114 S. Ct. 1304, 127 L. Ed. 2d 656 (1994).

> 'The demand should give the directors a fair opportunity to initiate the action which the shareholder wants to undertake, and name the potential defendants, as well as the shareholder making the demand.'

*McCann v. McCann*, 61 P.3d 585, 592 (Idaho 2002) (quoting 19 Am. Jur. 2d

*Corporations* §2278, 173-74 (1986)); *accord, e.g., Allison on Behalf of G.M.C. v. General*

*Motors Corp.*, 604 F.Supp. 1106, 1117 (D. Del.), *aff'd*, 782 F.2d 1026 (3d Cir.1985)

(under Delaware law, demand must identify the alleged wrongdoers, describe

factual basis of wrongful acts and harm caused to corporation, and request

remedial relief); *Musto v. OptiCare Health Centers, Inc.*, 1999 WL 439348, at *3

(Conn. Super. June 15, 1999) (same); *Syracuse Television, Inc. v. Channel 9 Syracuse,*

*Inc.*, 273 N.Y.S.2d 16, 24-25 (N.Y. Misc. 1966) (demand need not take any particular

form or recite any particular language).

   Here, the draft complaint accompanying the January 19 letter is the most

comprehensive form of demand that could be accomplished.   The draft complaint

identified the potential defendants, described in detail the "wrong complained of"

and provided sufficient information to enable the trustees to assess the merits of

plaintiff's allegations.  Plaintiffs' counsel in this case presented the trustees with a

ready-made complaint which they could act upon.  Accordingly, not only have

24

plaintiffs issued a demand with respect to the Growth Fund, the demand was

sufficient under Massachusetts law.[14]

**CONCLUSION**

For all the foregoing reasons, plaintiffs respectfully request that defendants'

motion to dismiss the Complaint be denied in its entirety.  In the alternative, if the

Court finds it necessary for plaintiffs to have alleged demand to support the state

law breach of fiduciary duty claim, plaintiffs respectfully request leave to amend

the Complaint to add allegations demonstrating satisfaction of the demand

requirement.  Finally, plaintiffs respectfully request that the Court grant such

other, further and different relief as may be just and proper.

Dated: New York, New York
      September 6, 2005

**ZIMMERMAN, LEVI & KORSINSKY, LLP**

By:     _Eduard Korsinsky_
           Eduard Korsinsky (EK 8989)
           39 Broadway, Suite 1601
           New York, New York 10006
           Tel: (212) 363-7500
           Fax: (212) 363-7171
           Attorneys for Plaintiffs

*Of Counsel*
      Lisa Solomon, Esq.

---

[14] If the Court finds it necessary for plaintiffs to have alleged demand to support the state law breach of fiduciary duty claim, plaintiffs request leave to amend to add allegations demonstrating satisfaction of the demand requirement.