**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- X
MEYER MINTZ and MEIR SPEAR,     :
        :
     Plaintiffs,     :
        :
     -against-     :     No. 05 Civ. 4904 (LTS)(HPB)
        :
RONALD BARON, MORTY SCHAJA, LINDA :     **FIRST AMENDED**
S. MARTINSON, STEVEN B. DODGE, :     **COMPLAINT**
NORMAN S. EDELCUP, DAVID I. FUENTE, :
CHARLES N. MATHEWSON, HAROLD W. :
MILNER, RAYMOND NOVECK, DAVID A. :
SILVERMAN, BARON CAPITAL, INC.,     :
        :
     Defendants,     :
        :
BARON GROWTH FUND, and BARON :
SMALL CAP FUND,     :
        :
     Nominal Defendants.     :
--------------------------------------------------------- X

      Plaintiffs, by their attorneys, Zimmerman, Levi & Korsinsky, LLP, allege upon personal knowledge as to themselves and their own acts, upon review of defendants' filings with the Securities and Exchange Commission and upon information and belief as to all other matters, the following:

### NATURE OF THE CASE

      1.     This is a shareholder derivative action on behalf of the Baron Growth Fund (the "Growth Fund") and the Baron Small Cap Fund (the "Small Cap Fund") (collectively the "Funds") against their board of trustees and other related parties seeking to remedy Defendants' breaches of fiduciary duties under the federal securities laws and state common law.

2.      Plaintiffs bring this action to recover certain expenses paid by the Growth Fund between September 12, 2003 and August 10, 2006 and the Small Cap Fund between April 22, 2005 and August 10, 2006 under Rule 12b-1 of the Investment Company Act of 1940 ("Rule 12b-1" or "12b-1 fees").

3.      The lawsuit names the distributor of the Funds, Baron Capital, Inc. ("Baron Capital" or the "Distributor"), and the board of trustees of the Funds, Ronald Baron, Morty Schaja, Linda S. Martinson, Steven B. Dodge, Norman S. Edelcup, David I. Fuente, Charles N. Mathewson, Harold W. Milner, Raymond Noveck, David A. Silverman (the "Trustees") (hereinafter, collectively the "Defendants"), for permitting the Funds to overcharge their shareholders for marketing and distribution related expenses under the guise of Rule 12b-1 payments.

4.      Although the Growth Fund and Small Cap Fund have been closed to new investors from September 12, 2003 and April 22, 2005, respectively, through August 10, 2006 (hereinafter "the Closed Period")[1], the Funds continued to pay Rule 12b-1 fees related to marketing and distribution when they were closed at the very same rate as when they were open to new investors with no apparent justification.

5.      This lawsuit seeks to recover any excessive Rule 12b-1 fees charged to the Funds that bear no reasonable relationship to the actual services provided.

## BACKGROUND

6.      Prior to 1980, using shareholders assets for distribution-related expenses incurred to sell fund shares to new investors was prohibited.  The SEC had

---

[1]      The Growth Fund and the Small Cap Fund have reopened to new investors as of August 10, 2006 following the filing of this lawsuit.

historically been reluctant to allow fund advisers to charge shareholders for selling fund shares to others, stating:

> [T]he cost of selling and purchasing mutual fund shares should be borne by the investors who purchase them and thus presumably receive the benefits of the investment, and not, even in part, by the existing shareholders of the fund who often derive little or no benefit from the sale of new shares.

Statement on the Future Structure of the Securities Markets, [Feb. 1972] Sec. Reg. & L. Rep. (BNA) No. 137 pt. II, at 7.

       7.    After intense lobbying by the mutual fund industry, the Commission agreed to consider modifying its objections to allow current fund shareholders to pay for distribution expenses as a deduction from the net asset value of the shares they hold in the mutual fund.  In early comment letters and in proxy statements proposing adoption of plans of distribution, the mutual fund industry argued that adding assets to an existing mutual fund would create economies of scale that would allow the advisers to provide the same quality and nature of services to mutual fund shareholders at dramatically lower costs.  In other words, fixed overhead expenses of the advisor, which are ordinarily borne by each shareholder on a pro rata basis, could be spread over more shareholders, therefore reducing each shareholder's pro rata share of the fixed expenses of the fund.

       8.    Accepting the mutual fund industry's argument that a growth in assets would lead to a quid pro quo reduction in expenses assessed against each shareholder's shares, the Commission tentatively approved Rule 12b-l.  However, due to the obvious conflicts of interest, numerous conditions were attached to the use of shareholders' assets to pay for distribution expenses that predominantly benefit the advisor.

9.      For example, no distribution related expenses may be assessed to shareholders under Rule 12b-1 unless such expenses are made pursuant to a written distribution plan duly adopted and approved by the trustees and shareholders of the fund. These distribution plans must be reviewed by the fund's trustees on an annual basis and all expenses paid under a plan must be reviewed on a quarterly basis.  Furthermore, the trustees must "request and evaluate . . . such information as may reasonably be necessary to an informed decision of whether such plan should be implemented or continued." 17 C.F.R. § 270.12b-1(d).

10.      In addition, minutes must be meticulously maintained to record all aspects of the trustees' deliberation, and the trustees must conclude "in light of their fiduciary duties under state law… that there is a reasonable likelihood that the distribution plans will benefit the company and its shareholders." 17 C.F.R. § 270.12b-l(e).  If the distribution plan provides no reasonable benefit to the fund or its shareholders then it must be terminated.

11.      Despite the noble intentions of Rule12b-1, recent studies by the SEC have shown, however, that Rule 12b-1 fees do not benefit fund shareholders, especially when the fees are assessed indefinitely:

> Prior studies have provided evidence that shareholders are not receiving sufficient benefits from expense scale economies to offset the 12b-1 fee.  In fact most of the studies show that expense ratios are higher for funds with 12b-1 fees by almost the entire amount of the fee.  This study confirms these results using a more recent dataset...

> In all, the evidence demonstrates that 12b-1 plans are successful at attaining faster asset growth; however, shareholders do not obtain any of the benefits from the asset growth.  This result validates the concerns raised by opponents of 12b-1 plans about the conflicts of interest created by these plans….

4

12b-1 plans do seem to be successful in growing fund assets, but with no apparent benefits accruing to the shareholders of the fund.  Although it is hypothetically possible for most types of funds to generate sufficient scale economies to offset the 12b-1 fee, it is not an efficient use of shareholder assets…. Fund advisers use shareholder money to pay for asset growth from which the adviser is the primary beneficiary through the collection of higher fees.

"*The Costs and Benefits to Fund Shareholders of 12b-1 Plans: An Examination of Fund Flows, Expenses and Returns,*" Lori Walsh, Financial Economist, Office of Economic Analysis, U.S. Securities and Exchange Commission, April 26, 2004 (http://www.sec.gov/rules/proposed/s70904/lwalsh042604.pdf).

12.    In fact, the SEC itself has observed that assessing Rule 12b-1 fees against shareholders' assets involve "unmanageable conflicts of interest that may harm funds and fund shareholders" and therefore is contemplating abolishing Rule 12b-1 fees altogether – even for mutual funds that are open to new investors (Proposed Rule: Prohibition on the Use of Brokerage Commissions to Finance Distributions, Investment Company Act Release No. IC-26356, at http: //www.sec.gov/rules/proposed/ic-26356.htm (Feb. 24, 2004)).

13.    Although, for now, Rule 12b-1 permits advisors to charge distribution related expenses against the Funds' shares, there is absolutely no justification for continuing to charge Rule 12b-1 fees for marketing and distribution during the Closed Period when the Funds admittedly were not soliciting new investors.

14.    Certainly, there exists no rational basis for **increasing** (by 80%) the Rule 12b-1 fees charged to shareholders after the Growth Fund closed to new investors. Yet, this is precisely what occurred:  For the fiscal year ending September 30, 2004, the Growth Fund paid 80% more in Rule 12b-1 fees than in the prior year period when the

Growth Fund was open to new investors.  For fiscal year ending September 30, 2005, the Rule 12b-1 fees increased another 61% during which time the Growth Fund was not marketed to new investors at all.  The Rule 12b-1 fees charged after the Growth Fund closed to new investors, therefore, had absolutely no correlation to any increase in promotion, marketing, distribution or other services provided to the Fund.  The correlative discord between the Rule 12b-1 fees and the promotion, marketing and distribution services purportedly provided to shareholders cannot be disputed.

15.     Furthermore, the Rule 12b-1 fees charged to the Growth Fund bear no reasonable relationship to the services provided because the Growth Fund has been charged a 0.25% Rule 12b-1 fee on the portion of the Growth Fund asset base that appreciated due to favorable market conditions rather than because of any increase in services provided to the Growth Fund.  That is, Rule 12b-1 fees have been assessed against the appreciated portion of the Growth Fund's assets even though those assets did not require the expenditure of marketing or distribution expenses, nor have these appreciated assets added new investors to the Fund raising the Fund's administrative cost structure. With respect to the payment of Rule 12b-1 fees on the Growth Funds' appreciated assets, the Fund is being charged Rule 12b-1 fees on these assets and is receiving absolutely nothing in return.

16.     Similarly, the increase in Rule 12b-1 fees charged after the Small Cap Fund closed to new investors had absolutely no correlation to any increase in promotion, marketing or distribution services provided to shareholders.  In addition, the Small Cap Fund shareholders have been charged a 0.25% Rule 12b-1 fee on the portion of the Small Cap Fund asset base that appreciated due to favorable market conditions despite

the fact that the Rule 12b-1 fees charged bear absolutely no relationship to any increase in services provided to the Small Cap Fund or its shareholders.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise as a result of Defendants' breach of their fiduciary duties under Section 36(b) of the Investment Company Act of 1940, 15 U.S.C. § 80a-35 (the "Investment Company Act") and common law.

18.     This Court has jurisdiction over the subject matter of this action pursuant to Section 36(b)(5) of the Investment Company Act.  This Court has pendent jurisdiction over claims premised on state law.

19.     Venue is proper in this district because many of the acts and injuries alleged in this Complaint occurred within this District.

## PARTIES

20.     Plaintiff Meyer Mintz at all relevant times has been an owner of shares of the Growth Fund.

21.     Plaintiff Meir Spear at all relevant times has been an owner of shares of the Small Cap Fund.

22.     Non-party BAMCO maintains its principal place of business at 767 Fifth Avenue, New York, NY 10153.  BAMCO is subsidiary of Baron Capital Group, Inc. ("BCG") and is, and at all relevant times was, the investment adviser to the Funds.

23.     Defendant Baron Capital is a registered broker-dealer and the distributor of shares of the Funds.  Baron Capital is a subsidiary of BCG and an affiliate of BAMCO.

7

24.     Nominal Defendant Growth Fund is a no-load, open-end, diversified management investment company that is part of a Massachusetts business trust organized on February 19, 1987.  The Growth Fund commenced trading on January 3, 1995.

25.     Nominal Defendant Small Cap Fund is part of the same Massachusetts business trust and commenced trading on October 1, 1997.

26.     Defendant Ronald Baron is the president, chief executive officer, chief investment officer, a Trustee and portfolio manager of the Funds.

27.     Defendant Morty Schaja is the executive vice president, chief operating officer and a Trustee of the Funds.

28.     Defendant Linda S. Martinson is the vice president, secretary, general counsel and a Trustee of the Funds.

29.     Defendant Steven B. Dodge is a Trustee of the Funds.

30.     Defendant Norman S. Edelcup is a Trustee of the Funds.

31.     Defendant David I. Fuente is a Trustee of the Funds.

32.     Defendant Charles N. Mathewson is the Chairman and a Trustee of the Funds.

33.     Defendant Harold W. Milner is a Trustee of the Funds.

34.     Defendant Raymond Noveck is a Trustee of the Funds.

35.     Defendant David A. Silverman is a Trustee of the Funds.

36.     Defendants Ronald Baron, Morty Schaja, Linda S. Martinson, Steven B. Dodge, Norman S. Edelcup, David I. Fuente, Charles N. Mathewson, Harold W. Milner, Raymond Noveck and David A. Silverman are herein collectively referred to as the "Trustee Defendants"

8

# FACTS

37.     At all relevant times, BAMCO has served as the investment advisor to the Funds.  As the investment adviser, BAMCO is responsible for making investment decisions concerning the Funds' assets and, together with the Funds' officers, administers the Funds' daily operations.  For providing these investment advisory services, the Funds pay BAMCO an advisory fee based on average daily net assets of the Funds.  For the fiscal year ended September 30, 2004, the Growth Fund paid BAMCO advisory fees of $27,394,586 and the Small Cap Fund paid BAMCO $16,072,603 in advisory fees.

38.     In addition to paying these substantial advisory fees to BAMCO directly, the Funds have also been assessed, pursuant to Rule 12b-1, a fee of 0.25% of the Funds' average daily net assets purportedly for expenses incurred in connection with marketing, distributing and servicing shares of the Funds.  These expenses are generally assessed on a monthly basis and constitute a permanent reduction in the net asset value of the Funds' shares for that month.

39.     As described above, for now the SEC tolerates this expense allowance provided the Funds' Trustees have enacted a distribution plan in compliance with Rule 12b-1 in order to prevent any unjust enrichment at the expense of the shareholders of the Funds.

40.     Among other things, Rule 12b-l requires that payments for distribution be made pursuant to a written plan "describing all material aspects of the proposed financing of distribution;" all agreements with any person relating to implementation of the plan must be in writing; the plan and any related agreements must be approved by a vote of the majority of the board of directors/trustees; and the board of

directors/trustees must review, at least quarterly, "a written report of the amounts so expended and the purposes for which such expenditures were made." Additionally, the Trustees "have a duty to request and to evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to make an informed determination of whether the plan should be implemented or continued."

41.     After the implementation of the distribution plan, the Trustees may permit the Funds to continue charging shareholders Rule 12b-1 fees "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and (b)] of the [Investment Company] Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders." 17 C.F.R. § 270.12b-l(e).

42.     Under the distribution plan approved by the Trustees in this case (the "Distribution Plan"), the Funds may be charged 0.25% of their average daily net assets for marketing and distribution related expenses pursuant to Rule 12b-1.  According to the Funds' SEC filings, these distribution related expenses are paid directly to the Funds' Distributor (Baron Capital) in connection with its activities or expenses primarily intended to result in the sale of shares, such as compensation to registered representatives or other employees of the Distributor; compensation to, and expenses of, employees of the Distributor who engage in or support the distribution of shares or who service shareholder accounts; telephone expenses; preparing, printing and distributing promotional and advertising material; preparing, printing and distributing the Prospectus and reports to

other than current shareholders; compensation for certain shareholder services; and commissions and other fees to broker-dealers or other persons (excluding banks) who have introduced investors to the Funds.

**The Growth Fund**

43.     On September 12, 2003, the Growth Fund closed to new investors. During the Closed Period, the Growth Fund only accepted investments from a limited number of investors that had a pre-existing relationship with the Fund such as financial advisors with existing clients in the Fund, clients of retirement plan providers or 529 plan providers, and employees of the Adviser and their family members.

44.     Thus, during the Closed Period, the Growth Fund not only ceased soliciting new investors but also discouraged additional investments in the Fund by closing the Growth Fund to new investors.  As such, any Rule 12b-1 fees charged to the Growth Fund related to promotion or distribution of shares to new investors should have been substantially reduced or eliminated altogether.

45.     Yet, the Growth Fund continued to pay the same 0.25% of assets in Rule 12b-1 fees during the Closed Period as it did when the Growth Fund was open for business and soliciting new investors.

46.     Even more egregious, although the Growth Fund admittedly ceased its marketing activities during the Closed Period, Rule 12b-1 fees almost tripled in size during this period even though there was no corresponding recognizable increase in services rendered to the Growth Fund or its shareholders.

47.     Specifically, for the fiscal year ended September 30, 2004, when the Growth Fund was closed to new investors, the Growth Fund paid $6,848,646 in Rule 12b-1

fees as compared to only $3,811,078 in fiscal 2003 when the Fund was open to new investors.

48.     For Fiscal 2004, shareholders therefore paid $6.8 million in Rule 12b-1 fees purportedly for marketing and distribution related expenses when no such marketing or distribution activities took place.  In other words, shareholders paid $6.8 million in fiscal 2004 and received virtually nothing in return other than ongoing shareholder servicing, a commodity service that can be obtained for a fraction of this amount from a variety of vendors.

49.     The same occurred during the following years when the Growth Fund was closed to new investors, albeit shareholders were taken for a larger sum.  For the fiscal year ending September 30, 2005, shareholders paid an additional $10,999,392 in Rule 12b-1 fees when the Fund was closed to new investors.

50.     For the six-month period ending March 31, 2006, shareholders paid another $6,489,355 in Rule 12b-1 fees even though the Growth Fund was not marketing shares to new investors.

51.     All these Rule 12b-1 fees charged to investors during the Closed Period had absolutely no rational relationship to any actual marketing and distribution expenses incurred by the Growth Fund because the Rule 12b-1 fees steadily climbed while the Growth Fund had ceased marketing shares to new investors and shareholder services remained essentially the same.

52.     Therefore, for the Growth Fund alone, shareholders were charged approximately $24.2 million in Rule 12b-1 fees during the Closed Period without receiving $24.2 million in marketing, distribution or servicing benefits.  At most, the Growth Fund

received limited commodity type, back-office, servicing of existing shareholder accounts (e.g., statements and telephone support) that can be provided by third parties at a fraction of the cost.  In any event, the servicing costs did not increase because the Growth Fund did not market or distribute to new investors during the Closed Period.  Therefore, there is no rational justification for the dramatic increase in Rule 12b-1 fees during the Closed Period.

53.     Furthermore, and most disturbing, the Growth Fund continues to be charged, under the guise of Rule 12b-1, a fee of 0.25% of the portion of the Growth Fund's assets that is the result of asset appreciation rather than paid-in capital generated through any purported marketing activities.  In other words, shareholders have been paying millions of dollars in additional marketing/servicing fees simply because the assets of the Growth Fund appreciated and not because they have been receiving any additional services in exchange for these fees.  This is a clear violation of state common law and Section 36(b) that requires fees charged to be reasonably related to the services rendered.

54.     Specifically, As of March 31, 2006, of the $5,693,061,194 of net assets in the Growth Fund, $1,883,529,542 of these assets were due solely to market appreciation.  The appreciation of the Growth Fund's asset base was not due to any increase in marketing or distribution activities and because these assets do not create additional shareholders that require servicing, no additional cost is incurred to service the existing shareholder base.  Thus, Growth Fund shareholders have been paying 0.25% of approximately $1.8 billion in appreciated assets of the Growth Fund even though no additional marketing, distribution or shareholder servicing costs were expended in relation to these shares.

55.     This is a violation of state common law and Section 36(b) that requires fees paid pursuant to Rule 12b-1 be reasonably related to the services rendered. Moreover, this scheme makes it impossible for shareholders to enjoy any economies of scale because the Rule 12b-1 fees rise in tandem with the asset appreciation, rather than remaining steady or decreasing as the Rule 12b-1 fees are spread over a larger asset base. This is a violation of Section 36(b) which requires that shareholders receive the benefits of economies of scale if they are to be charged with fees that primarily inure to the benefit of the advisor and/or its affiliates.

56.     There is absolutely no rational justification for charging Rule 12b-1 fees on the appreciated portion of the Growth Fund's asset base even if the Growth Fund was *not closed* to new investors.  Doing so during the Closed Period was all the more egregious because the Rule 12b-1 fees had absolutely no relationship to any marketing, distribution or shareholder servicing activities allowed for by the Growth Fund's Rule 12b-1 plan.

57.     In sum, with respect to the Growth Fund, not only did Baron Capital continue collecting Rule 12b-1 fees during the Closed Period at the same rate as when the Growth Fund was open to investors, the amount it collected during the Closed Period almost tripled in size with the Growth Fund receiving absolutely nothing more in return for paying the millions in additional Rule 12b-1 fees.  This is a clear violation of Section 36(b) and state common law.

**The Small Cap Fund**

58.     Defendants have engaged in the same misdeeds with respect to the Small Cap Fund that closed to new investors on April 22, 2005.

14

59.     For the fiscal year ending September 20, 2004 during which time the Small Cap Fund was being marketed to new investors, the Small Cap Fund was charged $4,018,151 in Rule 12b-1 fees.  For the period between March 31, 2005 and March 31, 2006, during which time the Small Cap Fund was almost entirely closed to new investors, the Small Cap Fund was charged $7,078,890 in Rule 12b-1 fees – a 76% increase.  This dramatic increase was not related to any increase in marketing distribution or shareholder servicing provided to the Small Cap Fund and therefore a direct violation of state common law and Section 36(b).

60.     Furthermore, as with the Growth Fund, a substantial portion of the asset base of the Small Cap Fund is attributed to asset appreciation and not paid-in capital generated through marketing activities.  As of March 31, 2006, the Small Cap Fund had assets of $3,356,842,758, of which $1,066,063,160 was due solely to asset appreciation.

61.     The appreciation of the Small Cap Fund's asset base was not due to any increase in marketing or distribution activities and no additional cost is required to service the shareholder base because the additional assets were not the product of additional investors entering into the Small Cap Fund.

62.     As with the Growth Fund, there is absolutely no rational justification for charging a 0.25% fee on the appreciated portion of the Small Cap Fund's asset base even if the Small Cap Fund did not close to new investors.  Doing so when the Small Cap Fund was closed to new investors, and raising the Rule 12b-1 fees by approximately 76% is a violation of state common law and Section 36(b) because the fees were not reasonably related to any marketing, distribution or shareholder servicing activities rendered to the Small Cap Fund.

**Distribution Agreements with Broker-Dealers**

63.     Moreover, upon information and belief, the Trustees have placed the interests of the Advisor and Distributor above those of the shareholders of the Funds by failing to terminate various distribution agreements the Funds have with broker-dealers that could have substantially reduced the Rule 12b-1 fees paid by the Funds.

64.     For example, upon information and belief, the Funds have entered into distribution agreements with broker-dealers like Charles Schwab & Co., Inc. and Fidelity Brokerage Services, Inc./National Financial Services Corp. to list their shares on the broker-dealers' electronic distribution platforms.  These platforms permit customers of the broker-dealers to purchase and sell shares of the Funds directly in their brokerage accounts, presumably attracting more investors to the Funds.  This arrangement is called providing "shelf-space" to the Funds in order to broaden their exposure to the public market and to induce customers of the broker-dealers to purchase shares of the Funds.

65.     The primary service provided by the broker-dealers is the "shelf space" on their distribution platforms. As a necessary by-product, the broker-dealers also provide servicing to their existing shareholders who purchase shares of the Funds through the broker-dealers' distribution platforms (e.g., statements and customer support).

66.     Upon information and belief, the Funds entered into distribution agreements with broker-dealers in order to gain access to the broker-dealers' customers through their distribution platforms and not in order to obtain shareholder services which is a commodity service furnished by third-party vendors at a fraction of the cost on a per shareholder basis.

67.     The Funds' Rule 12b-1 plan was used to pay for the majority of the fees charged by the various broker-dealers under the distribution agreements described above.

68.     Upon information and belief, the Funds pay broker-dealers at least 0.25% of net assets held by customers of the respective broker-dealer.  After closure, when the Funds were no longer being marketed to new investors, the broker-dealers' role was reduced to routine maintenance and servicing of their shareholder accounts that continued to hold the Fund's shares.  Because the assets held by the Funds appreciated significantly after they closed, the Rule 12b-1 payments paid to the various broker-dealers increased dramatically even though the Funds were no longer marketed to new investors and the bookkeeping services provided to the Funds by the various broker-dealers did not increase.  Thus, the Rule 12b-1 payments made in relation to these distribution agreements during the Closed Period were not reasonably related to the services rendered to the Funds and the Funds continued to overpay for services provided by the various broker-dealers during the Closed Period.

69.     The distribution agreements with broker-dealers could have conceivably benefited the Funds and their shareholders if the growth in assets led to economies of scale for existing shareholders.  In such a case, promotional and marketing expenses incurred under the agreements could, arguably, be fairly assessed to shareholders under Rule 12b-1.

70.     However, during the Closed Period, the Funds' shares were not marketed to new investors and the only services the broker-dealers were providing during the Closed Period were basic bookkeeping services such as maintaining existing

shareholder account information.  Thus, during the Funds' closure, shareholders reaped absolutely no benefits from being listed on these distribution platforms other than receipt of basic bookkeeping services.[2]

71.     Rule 12b-1 requires the Trustees to review on a quarterly basis the expenses incurred by the Funds to determine whether such expenses are reasonably related to the actual services provided.  Furthermore, Rule 12b-1 requires that any agreement entered into by the Funds pursuant to a Rule 12b-1 plan must be terminable on no more than sixty days notice.  Because the distribution expenses being paid to broker-dealers during the Closed Period had no reasonable relation to the services provided, the distribution agreements should have either been terminated or the fees paid to the broker-dealers using Rule 12b-1 plan should have been shifted to Baron Capital.

72.     Yet, the Trustees did not terminate these distribution agreements with the various broker-dealers or shift the cost of these distribution agreements away from the Funds even though no marketing or distribution to new investors hade taken place during the Closed Period.

73.     This suit seeks to recover all of the aforementioned excessive Rule 12b-1 fees charged to the Funds during the Closed Period.

### PLAINTIFFS' DEMAND

74.     On January 19, 2005, Plaintiffs' counsel wrote to Linda Martinson, Esq., the General Counsel of Baron Capital, enclosing a draft complaint setting forth specific allegations concerning the payment of excessive Rule 12b-1 fees by the Growth

---

[2]     Notably, it is highly unlikely that shareholders could ever enjoy any economies of scale as a result of an increase in assets.  This is because under the existing fee structure for the Funds any increase in the Funds' asset base results in a corresponding increase in the Rule 12b-1 fees assessed against the Funds' assets.

Fund.  The letter specifically stated that its purpose was "to inform the directors/trustees of the Fund of the allegations stated in the complaint and demand that they take action to eliminate the improper fees being charged to the Fund under Rule 12b-1."

75.     In a letter dated February 1, 2005, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden Arps"), the attorneys for Baron Capital, stated that the trustees would examine the issues raised in the January 19th letter and draft complaint at their next scheduled meeting in early May.  By letter dated May 12, 2005, Skadden Arps informed Plaintiffs' counsel that the Trustees had met, reviewed the allegations of the draft complaint, considered them to be meritless, and therefore "rejected [the] demand." Plaintiffs then filed this action after receiving such rejection of Plaintiffs' demand.

76.     Plaintiff's January 19, 2005 demand was sufficient because it identified the potential defendants, described in detail the wrong complained of and provided sufficient information to enable the Trustees to assess the merits of Plaintiffs' allegations.

77.     Therefore, with respect to Plaintiffs' state law breach of fiduciary duty claim, demand upon the Funds have been made and already rejected.

### COUNT I
### VIOLATION OF SECTION 36(b) OF
### THE INVESTMENT COMPANY ACT
### (AS TO BARON CAPITAL)

78.     Plaintiffs repeat and reallege each of the preceding allegations as though fully set forth herein.

79.     This Count is asserted against Baron Capital for the breach of their fiduciary duty pursuant to Section 36(b) of the Investment Company Act.

80.     As an affiliate of the adviser to the Funds, Baron Capital had a duty to act with the highest degree of loyalty and fidelity to the Funds.

81.     Baron Capital breached its duty of loyalty to the Funds by charging the Funds Rule 12b-1 fees for promotion, distribution and other expenses that lacked any reasonable relationship to the actual services provided to the Funds or actual expenses incurred on behalf of the Funds.

82.     By reason of their conduct described herein, Baron Capital violated Section 36(b) of the Investment Company Act.

83.     As a direct, proximate and foreseeable result of Baron Capital's breach of their fiduciary duty to the Funds, the Funds have suffered damages.

84.     Plaintiffs, by this action, seek to recover the excessive Rule 12b-1 fees charged to the Funds.

## COUNT II
## BREACH OF FIDUCIARY DUTY
## (AS TO ALL DEFENDANT TRUSTEES)

85.     Plaintiffs repeat and re-allege each allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

86.     Under Massachusetts law, the Defendant Trustees are in a relationship of trust and confidence with the Funds and their shareholders and owe a duty directly to the Fund and their shareholders to act with the highest degree of loyalty and fidelity. *See Boston Safe Deposit & Trust Co. v. Lewis*, 317 Mass. 137, 140 (Mass. 1944); ("A trustee must exercise good faith and act solely in the interests of the beneficiaries in administering the trust."); *Fogelin v. Nordblom*, 402 Mass. 218, 222 (Mass. 1988) ("It is axiomatic that the … trustees stood in a fiduciary relationship to all of the beneficiaries of

the trust"); *Rutanen v. Ballard,* 424 Mass. 723, 731 (1997) ("A trustee must exercise good faith and act solely in the interests of the beneficiaries in administering the trust.")

87.     The Defendant Trustees have breached the aforementioned fiduciary duty under state common law by causing the Funds to be overcharged for marketing, distribution and shareholder servicing expenses during the Closed Period.

88.     By reason of Defendant Trustees misconduct, the Funds have been damaged.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Awarding compensatory damages to the Funds against Defendants; together with pre-judgment interest at the maximum rate allowable by law;

B.     Enjoining Defendants from overcharging the Funds or their shareholders excessive Rule 12b-1 fees relating to marketing, distribution and shareholder servicing;

C.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable allowances of fees for Plaintiffs' attorneys and experts; and

D.     Granting all further other relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  New York, New York
       October 6, 2006

**ZIMMERMAN, LEVI & KORSINSKY, LLP**


By:    _____
       Eduard Korsinsky (EK 8989)
       39 Broadway, Suite 1601
       New York, New York 10006
       Tel: (212) 363-7500
       Fax: (212) 363-7171

       Attorneys for Plaintiffs