UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MEYER MINTZ and MEIR SPEAR,<br><br>　　　　　　　　Plaintiffs,<br><br>　　-against-<br><br>RONALD BARON, MORTY SCHAJA, LINDA S. MARTINSON, STEVEN B. DODGE, NORMAN S. EDELCUP, DAVID I. FUENTE, CHARLES N. MATHEWSON, HAROLD W. MILNER, RAYMOND NOVECK, DAVID A. SILVERMAN, BARON CAPITAL, INC.,<br><br>　　　　　　　　Defendants,<br><br>BARON GROWTH FUND, and BARON SMALL CAP FUND,<br><br>　　　　　　　　Nominal Defendants. | **Civil Action No. 05 CV 4904 (LTS)** |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

　　　　　　　　　　　　　　　　　ZIMMERMAN, LEVI & KORSINSKY, LLP
　　　　　　　　　　　　　　　　　Eduard Korsinsky (EK8989)
　　　　　　　　　　　　　　　　　Pamela Lynam Mahon (PM2380)
　　　　　　　　　　　　　　　　　39 Broadway, Suite 1601
　　　　　　　　　　　　　　　　　New York, New York 10006
　　　　　　　　　　　　　　　　　Tel: (212) 363-7500
　　　　　　　　　　　　　　　　　Fax: (212) 363-7171
　　　　　　　　　　　　　　　　　E-Mail: ek@zlk.com

　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs Meyer Mintz and Meir
　　　　　　　　　　　　　　　　　Spear

December 1, 2006

# TABLE OF CONTENTS

|  | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| STATEMENT OF FACTS | 1 |
| ARGUMENT | 4 |
| POINT I: DISMISSAL OF THE AMENDED COMPLAINT IS INAPPROPRIATE AS PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO SUPPORT THEIR SECTION 36(b) CLAIM | 4 |
|     A. Plaintiffs Have Sufficiently Pled that the 12b-1 Fees Are Excessive | 6 |
|     B. Plaintiffs Have Alleged that Baron Capital is a "Recipient" Under Section 36(b) | 8 |
|     C. The *Amron* Decision is Not a Basis to Disturb this Court's Previous Order | 9 |
|     D. Excessive Post-Filing Fees Are Actionable Under Section 36(b) | 11 |
| POINT II: PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM SHOULD NOT BE DISMISSED | 12 |
|     A. Plaintiffs' Breach of Fiduciary Duty Claim is Premised On State Law | 12 |
|     B. Plaintiffs Have Satisfied the Demand Requirement With Respect to Count II | 12 |
|     C. The Trustees Refusal of the Demand Was Improper | 14 |
| CONCLUSION | 17 |

## PRELIMINARY STATEMENT

Plaintiffs Meyer Mintz and Meir Spear respectfully submit this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Complaint ("Defendants' Motion"). Defendants' Motion should be denied because: (i) the Amended Complaint pleads facts that this Court has already deemed to be sufficient to demonstrate that certain marketing and distribution related expenses paid by the Baron Growth Fund (the "Growth Fund") and Baron Small Cap Fund (the "Small Cap Fund") during the period when these funds were closed to new investors bore no reasonable relationship to the marketing or distribution services provided to the shareholders; (ii) Defendants' Motion provides no legitimate reason to disturb the Court's September 18, 2006 Order with respect to the sufficiency of Plaintiff's claims; (iii) Plaintiffs' state law claim is premised on state fiduciary duty law and is not based on Rule 12b-1 of the Investment Company Act of 1940 (the "ICA"); and (iv) Plaintiffs have fully complied with Massachusetts' demand statute. Accordingly, Defendants' Motion should be denied in its entirety.

## STATEMENT OF FACTS

Plaintiff Meyer Mintz is a shareholder of the Baron Growth Fund and Plaintiff Meir Spear is a shareholder of Baron Small Cap Fund (collectively "the Funds"). Complaint, ¶¶ 20, 21. Baron Capital, Inc. ("Baron Capital") is a registered broker-dealer and the distributor of shares of the Funds. *Id.*, ¶ 23. The individual Defendants are trustees of the Funds. *Id.*, ¶¶ 26-36.

Pursuant to Rule 12b-1 of the "ICA", the Plaintiff along with the other shareholders of the Funds have been paying a fee of 0.25% of their average daily net

assets purportedly for expenses incurred in connection with promoting, marketing and distributing the Funds' shares. *Id.*, ¶ 38. According to SEC filings, these distribution related expenses are paid directly to Defendant Baron Capital. *Id.*, ¶¶ 42, 57.

In order to prevent any unjust enrichment at the expense of the shareholders, the SEC mandates that any payment for distribution must be made pursuant to a predefined plan of distribution duly adopted and approved by the trustees and shareholders of the fund (the "Rule 12b-1 Plan"). *Id.*, ¶¶ 39-41. The Rule 12b-1 Plan must be kept under continuing review in accordance with Rule 12b-1 of the ICA. *Id.*, ¶ 40. *See* 17 C.F.R. § 270-12b-1. Pursuant to section 12b-1 of the ICA, trustees may only approve and ratify a Rule 12b-1 plan if they conclude that, "in light of their fiduciary duties under state law and under sections 36(a) and (b) of the Act, there is a reasonable likelihood that the plan will benefit the company and its shareholders..." *Id.*, ¶ 8.

The Growth Fund and Small Cap Fund were closed to new investors from September 12, 2003 and April 22, 2005, respectively, through August 10, 2006 (hereinafter "the Closed Period"). *Id.*, ¶¶ 4, 43, 58. During the Closed Period, the Funds ceased soliciting new investors and only allowed investments from select investors with a pre-existing relationship with the Funds, *e.g.*, employees of the Funds' investment advisor and their family members, financial advisors with existing clients in the Funds, clients of retirement plan providers or 529 plan providers. *Id.*, ¶¶ 43, 44. In fact, as these select investors already had an established relationship with the Funds, they did not require any of the marketing and distribution services otherwise necessary to sell to new investors. *Id.*, ¶ 43, 54. Nevertheless, during the Closed Period, shareholders continued

to pay the Rule 12b-1 fees for marketing and distribution *at the same rate* as when the Funds were open to new investors. *Id.*, ¶¶ 4, 45, 51, 57, 59, 62.

Despite there being no justification for continuing to charge Rule 12b-1 fees for marketing and distribution during the Closed Period, in the two years following the closure of the Growth Fund, the Rule 12b-1 fees increased dramatically in the amount of *80%* and *61%*, respectively and almost tripled over the course of the Closed Period. *Id.*, ¶¶ 14, 45-50. Specifically, for the fiscal year 2005, when the Growth Fund was closed to new investors, shareholders paid $10,999,392 in Rule 12b-1 fees as compared to only $3,811,078 in fiscal 2003 when the Growth Fund was open to new investors. *Id.*, ¶¶ 14, 47, 49. For the Small Cap Fund, the Rule 12b-1 fees increased 76% following its closure. *Id.*, ¶ 59. In fact, during March 31, 2005 through March 31, 2006, when the Small Cap Fund was open only to investors with a pre-existing relationship with the fund, shareholders paid $7,078,890 in Rule 12b-1 fees as compared to only $4,018,151 in fiscal year 2004 when the fund was fully engaged in marketing new investors. *Id.*, ¶ 59. In addition, the Funds continue to be charged a fee of 0.25% on the portion of the Funds' assets created purely by means of asset appreciation rather than fresh paid-in capital generated as a result of any purported marketing activities. *Id.*, 53-55, 60-62. Thus, shareholders have been paying millions of dollars in additional marketing/servicing fees simply because the assets of the Funds appreciated and not because they have been receiving any additional services in exchange for these fees. In plain terms, the shareholders have been paying millions for absolutely nothing in return.

On January 19, 2005, Plaintiffs' counsel wrote to Linda Martinson, Esq., the General Counsel of Baron Capital, enclosing a draft complaint detailing the specific

3

alleged wrongdoers and their wrongdoings regarding the excessive Rule 12b-1 fees paid by the Growth Fund shareholders. *Id.*, ¶ 74. The letter expressly noted that its purpose was "to inform the directors/trustees of the Fund of the allegations stated in the complaint and demand that they take action to eliminate the improper fees being charged to the Fund under Rule 12b-1." *Id.* By letter dated February 1, 2005, Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden Arps"), the attorneys for Baron Capital, informed Plaintiffs that the trustees would examine the issues raised in the January 19th letter and the draft complaint at their next scheduled meeting in early May. *Id.*, ¶ 75. Plaintiffs' counsel therefore waited and did not file a complaint. On May 12, 2005, Skadden Arps advised Plaintiffs' counsel that, upon review of the allegations of the draft complaint, the trustees had concluded that they were meritless and "rejected [the] demand." *Id.* (emphasis added). This action was filed more than 90 days after the trustees rejected the January 19, 2005 demand letter. *Id.*

## ARGUMENT

### POINT I

### DISMISSAL OF THE AMENDED COMPLAINT IS INAPPROPRIATE AS PLAINTIFFS HAVE PLED SUFFICIENT FACTS TO SUPPORT THEIR SECTION 36(b) CLAIM

Dismissal of a complaint before discovery, pursuant to Rules 12(b)(6) and 23.1 of the Federal Rules of Civil Procedure, is a "drastic step," *Meyer v. Oppenheimer Management Corp.*, 764 F. 2d 76, 80 (2d Cir.1985) (quoting *Wade v. Johnson Controls, Inc.*, 693 F.2d 19, 22 (2d Cir, 1982), that is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *E.g., Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). In

4

assessing the appropriateness of a motion to dismiss, courts have cautioned that complaints are not required to "lay out facts corresponding to every element of a legal theory." *Chapdelaine Corporate Securities & Co. v. Depository Trust & Clearing Corp.*, 05-Civ- 10711 (SAS), 2006 WL 2020950, at *2 (S.D.N.Y. July 13, 2006). Rather, the complaint should be construed liberally "accepting all factual allegations in the complaint as true" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002), and plaintiffs should receive "the benefit of any fact that could be established later consistent with the complaint's allegations." *Chapdelaine Corp. Securities & Co. v. Depository Trust & Clearing Corp.*, 2006 WL 2020950, at *2 (S.D.N.Y. July 13, 2006) (quoting *Simpson v. Nickel*, 2006 WL 1585445, at 2 (7th Cir. June 12, 2006).

Moreover, with respect to pleading requirements under Rule 8(a), this Court has stated that "a pleading adequately states a claim when it contains 'a short and plain statement of the claim showing that the pleader is entitled to relief,' and thus gives 'fair notice of what the plaintiff's claim is and the ground upon which it rests.'" *Pfeiffer v. Bjurman, Barry & Assoc.*, 2004 WL 1903075, at *3 (S.D.N.Y. Aug. 26, 2004) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)). Under the notice pleading standard, however, "it is not necessary to plead evidence." *Bogosian v. Gulf Oil Corp.*, 561 F. 2d 434, 446 (3d Cir. 1977).

Finally, it is well-established that the proper inquiry of a motion to dismiss involving a claim alleging a violation of Section 36(b) of the ICA is whether plaintiff has plead facts which, if proven true, demonstrate that the Rule 12b-1 fees charged are disproportional to the services rendered to the Fund. *See, e.g., Gartenberg v. Merrill*

*Lynch Asset Mgt., Inc.*, 694 F. 2d 923, 928 (2d Cir. 1982). Plaintiffs have indeed met this burden.

### A.   Plaintiffs Have Sufficiently Pled That the 12b-1 Fees Are Excessive

As this Court has previously determined, Plaintiffs' allegations contained in the original Complaint were sufficient to plead facts demonstrating that the Rule 12b-1 fees were disproportionate to the services rendered. *See* Memorandum Opinion and Order dated Sept. 18, 2006 ("Order"), p.8. There is no reason to disturb the Order merely because Plaintiffs were instructed by the Court to file the Amended Complaint to cure certain collateral deficiencies the Court found in the original Complaint. Nothing has changed with respect to the sufficiency of Plaintiffs' Section 36(b) claim with the filing of the Amended Complaint. The facts Plaintiffs alleged in the original Complaint and the Amended Complaint that support their Section 36(b) claim remain the same and include the following:

- the Funds were charged Rule 12b-1 fees at the very same rate during the Closed Period when the Funds ceased marketing and distributing to new investors and the services provided to the Funds during the Closed Period were reduced to routine bookkeeping services for which shareholders were overpaying, Amended Complaint, ¶¶ 4, 13, 43-45, 57, 59, 62, 63, 67, and 70-72;

- the select investors that were permitted to purchase Funds' shares during the Closed Period had a pre-existing relationship with the Funds and/or otherwise did not require the level of services required to market and distribute the Funds' shares to new investors, *Id.*, ¶¶ 14, 43, 44-46, 51-52, 59, and 62;

- there was a substantial multi-million dollar increase in the amount of Rule 12b-1 fees charged during the Closed Period despite the fact that no corresponding recognizable increase in services was provided to the shareholders during the Closed Period commensurate with the multi-million dollar increase in Rule 12b-1 fees charged to the shareholders, *Id.*, ¶¶ 14, 16, 46, 48, 50-52, 56, 59, and 62;

- even though the Funds ceased accepting money from new investors during the Closed Period, the Rule 12b-1 fees for marketing and distribution almost tripled for the Growth Fund and increased 76% for the Small Cap Fund during the Closed Period, *Id.*, ¶¶ 14, 46 and 59;

6

- for the fiscal year 2005, when the Growth Fund was closed to new investors, shareholders paid $10.9 million in Rule 12b-1 fees as compared to only $3.8 million in fiscal 2003 when the Growth Fund was open and engaged in services to market and distribute to new investors, *Id.*, ¶¶ 47, 49, 51; and

- for the period between March 31, 2005 and March 31, 2006, during which time the Small Cap Fund was almost entirely closed to new investors, the Small Cap Fund was charged $7,078,890 in Rule 12b-1 fees as compared to only $4,018,151 in the fiscal year ending September 20, 2004 when the Small Cap Fund was fully engaged in marketing to new investors, *Id.*, ¶ 59;

Furthermore, Plaintiffs have alleged that because approximately one-third of the asset base of the Funds was the result of asset appreciation due solely to favorable market conditions and not the result of fresh paid-in capital received from investors, the Rule 12b-1 fees that were assessed against these appreciated assets cannot possibly be related to any services rendered to the Funds. *Id.*, ¶¶53-55, 60-62. In stark terms, shareholders of the Funds have been, and continue to be, ripped off. The issue here is not about a discrepancy between the Rule 12b-1 fees being paid and the measure of value of services received in returned because the shareholders have received absolutely nothing in return for the additional Rule 12b-1 fees paid on the appreciated assets.

For example, as of March 31, 2006, the net assets of the Growth Fund were $5,693,061,194 and the portion of the net assets attributable to asset appreciation and not paid-in capital was $1,883,529,542. *Id.*, ¶54. Thus, the 0.25% Rule 12b-1 fee charged against this appreciated portion of asset base of the Growth Fund is $4,708,823. For the Small Cap Fund, the net assets as of March 31, 2006 were $3,356,842,758 of which $1,066,063,160 was due to market appreciation and not paid-in capital. *Id.*, ¶60-61. The 0.25% Rule 12b-1 fee charged against the appreciated portion of asset base of the Small cap Fund is therefore $2,665,157. Thus, for 2006 alone, the Funds will be paying approximately $7 million on appreciated assets for which they receive absolutely nothing

7

in return. Because the appreciated assets do not create any additional shareholders that require servicing and do not increase the Fund's administrative overhead structure, Defendants cannot claim that this exorbitant sum is necessary to cover additional servicing costs. Neither did the advisor expend any additional marketing efforts or costs to acquire these appreciated assets, so Defendants cannot claim that the $7 million goes towards any marketing and distribution expenses necessary to acquire these appreciated assets. The fact of the matter is, there is no justification for charging this $7 million in 2006, or any of the additional Rule 12b-1 fees charged in previous years, on the Funds' appreciated assets.

Accordingly, the facts pled in the original Complaint that the Court already deemed sufficient to support Plaintiffs' Section 36(b) claim as well as the facts pled in the Amended Complaint provide more than enough support for Plaintiffs' claim that the Rule 12b-1 fees charged to the Funds during the Closed Period were excessive and bore no reasonable relationship to the services rendered. Defendants' Motion provides no legitimate reason to disturb the Court Order with respect to the sufficiency of Plaintiffs' Section 36(b) claim.

**B.    Plaintiffs Have Alleged that Baron Capital is a "Recipient" Under Section 36(b)**

Plaintiffs have specifically alleged that the excessive Rule 12b-1 fees charged to the Funds were paid to Defendant Baron Capital. *See* Original Complaint, ¶ 39; Amended Complaint, ¶ 42 ("[a]ccording to the Funds' SEC filings, these distribution related expenses are paid directly to the Fund's Distributor (Baron Capital)"). An example of such SEC filings is a Form N-CSR filed by the Funds for the period ending March 31, 2006 that states:

8

> DISTRIBUTION FEES. Baron Capital, Inc. (*"BCI"*), a wholly owned subsidiary of BCG, is a registered broker-dealer and the distributor of the shares of the Funds pursuant to a distribution plan under Rule 12b-1 of the 1940 Act. The distribution plan authorizes the Funds to pay BCI a distribution fee equal on an annual basis to 0.25% of the Funds' average daily net assets.

(Ex. A, p. 32/48). Furthermore, Defendants have previously conceded that Baron Capital has in fact received, Rule 12b-1 fees within the meaning of Section 36(b) and that Plaintiffs have properly alleged this fact. *See* Defendants' Memorandum to Dismiss Complaint, p. 9, n. 6) ("As alleged in the complaint (Compl. ¶39), Baron Capital is the only defendant that has received 12b-1 fees"). Thus, while the Court dismissed Plaintiff's Section 36(b) claim against BAMCO stating that there was no allegation that BAMCO received Rule 12b-1 fees, the Court denied dismissal with respect to Baron Capital because Plaintiff did properly allege that Baron Capital is a recipient of Rule 12b-1 fees. *See* Order dated Sept. 18, 2006, p.7.

Defendants attempt to re-litigate issues that they have already conceded to and that have already been decided by the Court should be ignored. Defendants simply have no basis to raise this issue during this stage of the proceeding, especially because they have already admitted that Baron Capital was a recipient of the 12b-1 fees under Section 36(b).

**C.    The *Amron* Decision is Not a Basis to Disturb the Court's Previous Order**

Contrary to what Defendants would have this Court believe, the Second Circuit's decision in *Amron v. Morgan Stanley Investment Advisors Inc.*, No. 04-3938 (2d Cir. Sept. 26, 2006) ("Slip op."), does not change the legal landscape with respect to the issues in this case but rather applies the "six well-established factors" set forth in *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir.1982) to determine

whether the fees at issue in that case were actionable under Section 36(b). Slip op. at 3. *Amron* offers nothing new.

In its Order, the Court already applied the *Gartenberg* test and concluded that Plaintiffs have properly alleged that the Rule 12b-1 fees paid to Defendant Baron Capital are excessive. *See* Order dated Sept. 18, 2006, pp. 7-9. Thus, Defendants' reference to *Amron* is just a red-herring in an effort to attempt to re-litigate what has already been decided.

Furthermore, aside from the fact that *Amron* simply applies the same *Gartenberg* standard that this Court has already applied in its Order, the allegations in *Amron* are very different from Plaintiffs' allegations in this case. In *Amron*, the Second Circuit affirmed dismissal because the plaintiffs failed to allege sufficient facts as to why the quality of the services received by the Fund in exchange for the Rule 12b-1 fees was of "no value." Slip op. at 4. The Court noted that the plaintiffs failed to allege any facts pertinent to the relationship between the Rule 12b-1 fees paid and the services received in exchange, including facts pertaining to the quality of the services received, (*Id.* at 10), and facts pertinent to the question of economies of scale (*Id.* at 11). Thus, plaintiffs' claim that the services received by the Fund were of "no value" was not supported by any alleged facts and were thus dismissed.

In this case, however, rather than alleging that the <u>quality</u> of the services received by the Funds were of "no value," as in *Amron*, Plaintiffs here have alleged, as detailed above, that: (i) during the Closed Period the Rule 12b-1 fees the Funds were charged dramatically increased even though the <u>quantity</u> of services being provided to the Funds was necessarily less because the Funds ceased marketing and distribution to new

10

investors; and (ii) Rule 12b-1 fees have been charged against the Funds' appreciated assets despite the fact that no marketing, distribution or shareholder servicing expenses were necessary to acquire or maintain these assets. In this case, Plaintiffs have presented specific and detailed allegations focused directly on the (lack of) relationship between the fees charged and the services rendered – namely, that the Rule 12b-1 fees charged to the Funds dramatically increased without a corresponding increase in services provided to the Funds and that the Funds are paying Rule 12b-1 fees for services they simply do not receive. Thus, while the Second Circuit in *Amron* held that the plaintiffs did not allege sufficient facts under the six *Gartenberg* factors to support their claim that the quality of services received had "no value," Plaintiffs here have met their pleading burden by alleging that the Funds simply did not receive a quantum of services that remotely justifies the dramatic increase in Rule 12b-1 fees charged to the Funds during the Closed Period.

Accordingly, Defendants request that the Court retract its Order in light of *Amron* should be denied.

**D.    Excessive Post-Filing Fees Are Actionable Under Section 36(b)**

Defendants' assertion that a Section 36(b) claim is limited to excessive fees charged in a one-year pre-filing "window" and that Plaintiffs are not entitled to damages for excessive fees charged to the Funds after this case was filed is plain wrong. Section 36(b)(3) provides that "[n]o award of damages shall be recoverable for any period *prior* to one year before the action was instituted," 15 U.S.C. § 80(a)-35(b)(3) (emphasis added). Thus, while Section 36(b)(3) imposes a statute of limitations with respect to excessive fees charged more than one-year prior to filing an action, Section 36(b)(3) in

11

no way excludes recovery for ongoing excessive fees charged after an action is commenced. This plain reading of Section 36(b)(3) has been confirmed. *See, e.g., Hunt v. Invesco Funds Group, Inc.*, 2006 WL 1751900, at *1 (S.D.Tex. June 22, 2006) ("the language of the ICA, that 'no award of damages shall be recoverable for any period prior to one year before the action was instituted,' does not limit damages for the period of time *following* the filing of this action.")(emphasis in original). Accordingly, Plaintiffs' Section 36(b) claim covers all excessive that were improperly charged to the Funds from one-year before this action was filed and onwards.[1]

## POINT II

### PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM SHOULD NOT BE DISMISSED

**A.    Plaintiffs' Breach of Fiduciary Duty Claim is Premised on State Law**

In its Order, the Court dismissed Count II of Plaintiffs' Complaint "insofar as Count II is premised on Section 12b-1 of the ICA." Order, p.13. Count II, however, is not premised on a violation of Section 12b-1 but is explicitly premised on Massachusetts fiduciary duty law. In particular, Plaintiffs have alleged that:

> Under Massachusetts law, the Defendant Trustees are in a relationship of trust and confidence with the Funds and their shareholders and owe a duty directly to the Fund and their shareholders to act with the highest degree of loyalty and fidelity. *See Boston Safe Deposit & Trust Co. v. Lewis*, 317 Mass. 137, 140 (Mass. 1944); ("A trustee must exercise good faith and act solely in the interests of the beneficiaries in administering the trust."); *Fogelin v. Nordblom*, 402 Mass. 218, 222 (Mass. 1988) ("It is axiomatic that the ... trustees stood in a fiduciary relationship to all of the beneficiaries of the trust"); *Rutanen v. Ballard*, 424 Mass. 723, 731 (1997) ("A trustee must exercise good faith and act solely in the interests of the beneficiaries in administering the trust.")

---

[1]    Although Defendants' Motion repeatedly states that Plaintiff commenced this action on January 14, 2005, (see Defendants' Motion, p.14), Plaintiffs filed this action on May 23, 2005.

12

Amended Complaint, ¶ 86. Count II cannot be dismissed because it is not premised on a violation of Section 12b-1 (or Section 36(b)) but rather is based solely on Defendants' breach of state fiduciary duty laws.

**B.    Plaintiffs Have Satisfied the Demand Requirement With Respect to Count II**

Plaintiffs January 19, 2005 demand letter, which included a draft complaint, ("Draft Complaint"), fully satisfied the demand requirements under Massachusetts law. According to the Comments to Mass. Gen. Laws Ann. Ch. 156D § 7.42 (West Supp. 2005) ("the Demand Statute"), a demand should be:

> sufficiently specific to apprise the corporation of the act or omission to be challenged and the grounds for that challenge so that the demand can be evaluated, and describe the relief requested. Because the corporation can contact the shareholder for clarification if there are any questions, the specificity of the demand should not become a new source of dilatory motions.

*Id*. Plaintiffs' demand letter together with the Draft Complaint could not be more specific with respect to the challenged conduct. The demand letter met the requirements of the statute by identifying the alleged wrongdoers, the wrongdoing they perpetrated as well as the relief requested. In particular, the demand letter stated that certain expenses charged to the Fund under Rule 12b-1 "have been excessive, unnecessary and lacking any reasonable relationship to the actual services provided and requested that the trustees "take action to eliminate the improper fees being charged." (Ex. B). The demand letter also stated that the "specific allegations are outlined in a Draft Complaint included with this letter." (*Id.*). The Draft Complaint specifically alleged that certain Rule 12b-1 fees were excessive and not related to the service rendered, (Ex. C, ¶¶ 7, 24-28), and identified Baron Capital as the recipient of the excessive Rule 12b-1 fees in breach of its duty to the shareholders. (*Id.*, ¶¶ 17, 34). The Draft Complaint also stated that the relief requested was the recovery of any excess Rule 12b-1 fees that were already charged and

13

that the charging of excess Rule 12b-1 fees should be stopped. (*Id.*, ¶¶ 8, 37). Thus, the January 19, 2005 demand letter was comprehensive and provided the trustees with sufficient detail so that the demand could be evaluated.

Furthermore, based on Defendants' response, it is obvious that the January 19, 2005 demand letter certainly made the trustees fully aware of the specific nature of the demand and the challenged conduct. A May 12, 2005 letter response from Skadden Arps on behalf of the trustees stated that the trustees rejected the "demand" and offered the trustees' justifications for not discontinuing the payments of ongoing excessive Rule 12b-1 fees as alleged in the Draft Complaint. Defendants' current attempt to cast the January 19, 2005 demand letter as ambiguous is therefore, squarely contradicted by the specific allegations contained in the demand and the trustees' detailed response and rejection of the demand.

Accordingly, the January 19, 2005 demand letter fully satisfied the requirements of the Demand Statute.

C.   **The Trustees' Refusal of the Demand Was Improper**

Subsequent to the decision in *Harhen v. Brown*, 730 N.E. 2d 859 (Mass. 2000), Massachusetts adopted a statute that governs the dismissal of a derivative proceeding (the "Dismissal Statute"). *See* Mass. Gen. Laws Ann. Ch. 156D §7.44 (West Supp. 2005). In particular, §7.44(d) states that:

> [i]f the corporation moves to dismiss the derivative suit, it shall make a written filing with the court setting forth facts to show (1) whether a majority of the board of directors was independent at the time of the determination by the independent directors and (2) that the independent directors made the determination in good faith after conducting a reasonable inquiry upon which their conclusions are based. Unless otherwise required by subsection (a), the court shall dismiss the suit unless the plaintiff has alleged with particularity facts rebutting the corporation's filing in its complaint or an amended complaint or in a written filing with the

14

> court. All discovery proceedings shall be stayed upon the filing by the corporation of the motion to dismiss and the filing required by this subsection until the notice of entry of the order ruling on the motion; but the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted.

Thus, to warrant dismissal of a derivative claim, it is the corporation who bears the burden and must allege sufficient facts demonstrating that a majority of the board was independent and that the independent directors' determination was made in good faith. If the corporation meets its burden, the plaintiff is then given the opportunity to submit a writing to the court that alleges facts in rebuttal.

In this case, without providing any factual support, Defendants simply allege in the most conclusory manner that a majority of the Funds' directors are disinterested and that their refusal of the demand was proper. *See* Defendants' Motion, p.19. Such a bare statement falls far short of the burden imposed on the Defendants by the Dismissal Statute. Defendants' failure to "set[] forth facts to show ... whether a majority of the board of directors was independent" utterly dooms their attempt to have Count II dismissed.

Furthermore, although Plaintiffs are not required to do so, they now submit to the Court facts demonstrating that the majority of the Funds' directors are in fact <u>not</u> disinterested and thus, under the Dismissal Statute, Plaintiffs' breach of fiduciary duty claim must be sustained.

Of the seven out of ten directors that Defendants claim are independent, Defendants Dodge and Fuente cannot be considered disinterested directors. Defendant David Fuente cannot be considered a disinterested director because since 1993 he has been a director of Dick's Sporting Goods, Inc., a corporation in which the Growth Fund

15

owns 2,500,000 shares valued at $75,275,000. [2] (*See* p. 22/68 of Form N-CSR for the period ending September 30, 2005, attached as Ex. D). This deep financial entanglement between the Growth Fund and Dick's Sporting Goods obviously renders Defendant Fuente incapable of being independent and disinterested.

Defendant Dodge also cannot be considered disinterested because he is the founder and chairman of American Tower Corp. and the Baron family of funds owns a significant number of shares in American Tower Corp. According to a Form N-CSR for the period ending September 30, 2005, the Small Cap Fund owned 3,350,000 shares of American Tower Corp valued at $83,582,500; the Growth Fund owned 2,200,000 shares at a value of $54,890,000; the Baron iOpportunity Fund owned 225,000 shares valued at $5,613,750, and the Baron Fifth Avenue Growth Fund owned 100,000 shares valued at $2,495,000. (Ex. D, pp. 20/68, 24/68, 28/68, and 30/68). In total, the Baron family of funds, of which Defendant Dodge is a director, owns 6,075,000 shares of American Towers Corp. stock worth $146,581,250. Defendant Dodge therefore can hardly be considered disinterested.

Given that both Defendant Fuente and Dodge cannot be considered disinterested, at most only five of the ten total directors of the Funds can be considered disinterested. The Court's inquiry should stop here because Defendants cannot overcome their burden of demonstrating a majority of independent directors as required by the Dismissal Statute. Plaintiffs have rebutted Defendants' conclusory assertions of an independent board and

---

[2] The board rejected the January 19, 2005 demand letter in a May 12, 2005 letter. The September 30, 2005 Form N-CSR is the first filing indicating the Funds share a common ownership since the Boards refusal and thus reflects the Growth Fund's financial stake in Dick's Sporting Goods at the time of the Boards demand refusal.

therefore Count II in the Amended Complaint cannot be dismissed under the Dismissal Statute.

## CONCLUSION

For the reasons stated, Plaintiffs respectively request that Defendant's Motion be denied in its entirety.

Dated: New York, New York
       December 1, 2006

                         ZIMMERMAN, LEVI & KORSINSKY, LLP

                        By: _____
                             Eduard Korsinsky (EK 8989)
                             Pamela Lynam Mahon (PM2380)
                             39 Broadway, Suite 1601
                             New York, New York 10006
                             Tel: (212) 363-7500
                             Fax: (212) 363-7171
                             Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Pamela Lynam Mahon, hereby certify that on December 1, 2006, I electronically filed the following document,

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to registered counsel; and on December 1, 2006, caused to be served by U.S. Mail, postage pre-paid, the following attorneys with hard copies of the filing:

December 1, 2006

/s/ Pamela Mahon
Pamela Mahon
ZIMMERMAN, LEVI & KORSINSKY, LLP
39 Broadway, Suite 1601
New York, NY 10006
Telephone: 212-363-7500
Facsimile: 212-363-7171